## Perkins v. Jackson et al.

Dec. 13, 1938.

J. B. CAMPBELL and R. S. ROSE for appellant.

HIRAM H. OWENS for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Appellant, S. M. Perkins, is appealing from a judgment dismissing his petition wherein he sought to recover $1,400 from appellees for a fraud alleged to have been perpetrated upon him at the time he bought an interest in a small casket and coffin making business in Barbourville, Kentucky, in 1930. Appellees, George Jackson, J. M. Jackson and John Jackson and W. R. Lay and W. W. Evans, all of Barbourville, were operating the business before Perkins purchased an interest in it. It appears that both Lay and Evans had put a few hundred dollars in the venture originally. The Jacksons, who were doing most of the work in the plant, were supposed to let a part of their labor go in as capital. It is probable that they also contributed small amounts to the enterprise in the way of equipment and machinery. George Jackson was the manager of the business. Apparently, it was operated with a minimum of record keeping. Appellant, who lived in Jellico.

Tennessee, and who appears to have been engaged primarily in concrete road work, was also engaged in making concrete burial vaults at that place. Some few months prior to September, 1930, he contacted George Jackson with the view of buying some caskets from the Barbourville company to sell with his concrete vaults.

Things were not going so well with the Casket Company; so, during the negotiations between George Jackson and Perkins, the question came up as to Perkins' buying an interest in the establishment. Jackson seems to have been having some difficulties with Lay,. so he worked out a plan whereby he was to buy Lay's interest in the Company and sell an interest in it to appellant. George Jackson said that he had arranged with Perkins to sell the Lay interest to him, but Perkins insists that this was not the case. He testified that he agreed to give George Jackson $1,000 for an interest in the Company, to be represented by 10 of the 36 shares in it when it was reorganized and incorporated. On this point he testified that:

> "A. I didn't give you anything or didn't expect to. It was my understanding, I told him to invoice his stock at wholesale cost, then when they deducted what they claimed and if there was any left, that was to go in and build the company up. That was what I supposed."

There is an entry in one of the books of the Barbourville Casket & Manufacturing Company which was filed as Exhibit No. 1, along with the deposition of George Jackson, setting forth an invoice of the Company's business and equipment as of October 30, 1930. This invoice, including an amount of $4.00 in the bank, amounted to $3428.74. The book showed that the Company owed $320 at that time. If these entries correctly represented the condition of the Company as of that date, the $1,000 was taken up approximately in payment for Perkins' interest in it. There is further evidence in the record that the $1,000 which Perkins put in the Company in September represented his original investment in the Company, and that this interest was bought from George Jackson. Perkins' own testimony is indicative of this.

When George Jackson bought Lay's interest in the Company he and his wife, Ola Jackson, executed a mort-

gage on their property to Lay on September 30, 1930, guaranteeing payment of the purchase price. The mortgage set out that Lay was to receive the sum of $450 as evidenced by a note, and that the Jacksons agreed immediately to take up and pay off all indebtedness against the Company except a note to the Rapp Lumber Company for $440, which note was to be paid off within 12 months after the date of the mortgage. There is no showing in the record as to the total amount of the debts of the Company on September 30, 1930, nor is Lay's individual part of the obligations shown, aside from the fact that he had signed notes for the Company. It is evident from the foregoing that there is no basis for appellant's contention that Lay was given only $450 by George Jackson for his interest in the Company.

Perkins made out his $1,000 check to George Jackson when he first bought into the Company. Jackson indorsed this check and turned it over to his wife, Ola Jackson, who in turn indorsed it. There is some evidence that this money was used to retire the obligations of the Casket Company and to pay, at least, a part of the $450 note to Lay. There is little or no evidence that any of Perkins' $1,000 actually went into the rehabilitation and reorganization of the Company except as indicated above. On this point, we cannot agree with appellant's contention that the facts surrounding his entry into the coffin making business by the payment of $1,000 for an interest in the Barbourville Company warranted an allegation of fraud on the part of the Jacksons.

Perkins visited the establishment from time to time, and there is evidence that difficulties soon arose as to the management of the Company. Incorporation papers were prepared, but no stock certificates were issued to the stockholders. At this time (October) Perkins' interest was represented by 10 shares of stock, George Jackson's 10, James Jackson's 6, John Jackson's 6 and Evans' 4.

On November 12th, Perkins sent a check for $400 to the Barbourville Casket & Manufacturing Company "for stock in Co." This check was indorsed in the name of the Company by George Jackson, and was deposited in the bank to the Company's credit. This money appears to have been used in carrying on the Company's business. On November 22nd, George Jackson wrote Perkins a letter at Jellico, Tennessee, in which

220

he acknowledged receipt of the check for $400, and stated that this made his total stock in the Company amount to $1,400. He said also that they had been working on a showroom and a trimming room. He pointed out that the business outlook was good, and that as soon as they got some silk to finish the interior of the coffins they would try out, in the trimming department, a woman in whom Perkins was interested. This lady came to Barbourville and worked only four days. George Jackson's testimony was to the effect that she was not competent to do the work, and that they did not need her any further at the time she was let out. This did not set very well with Perkins. Things seem to have been going along fairly well with the Company, however, and it was enjoying an increase in its business, but it was having trouble in collecting its outstanding accounts.

Perkins testified that by January, 1931, he thought things were not going as they should. He sent George Jackson a list of principles and rules for the operation of the Company. No dividends had been paid to any of the stockholders up to this time and all the Company's cash income went into wages for the Jacksons and for supplies and materials. On January 8, 1931, George Jackson wrote Perkins acknowledging receipt of his statement of principles for the operation of the Company. He set forth his views on operating the Company "sensibly and profitably," and stated that he was proud of the progress that had been made. He said also that he thought there was an opportunity for a bigger business, but if the time came when they could not all agree that he was going to break his relations with the Company. In this letter he pointed out that the Company needed an additional $1,000 and that he and his father and his brother John were willing to pledge their stock to guarantee the payment of their part of this amount if the money could be raised. It is not clear just what happened after January 8th, but, according to the testimony of Evans, who was still interested in the Company at that time, George Jackson decided to get out of the Company and did so. He took as his interest some machinery and equipment and some outstanding accounts, which, according to Jackson's testimony, had been objected to by certain of the stockholders. Perkins testified that he was asked to sign a paper relative to George Jackson's withdrawing from

the business, but that he would not do so. As indicated, however, Evans and the other owners of the Company agreed to the arrangements under which George Jackson left the Company. George Jackson immediately started up in the coffin business for himself and at the time his deposition was taken was operating the Kentucky Casket Company in Barbourville.

While Perkins testified that he had little to do with the Company after January, 1931, except to buy some caskets from it, there is testimony to the effect that the remaining stockholders, including Perkins, continued to operate the business until July 5, 1933, when Jim Jackson gave Perkins $124.57 for his interest in what was left of the Company in the way of materials and supplies. Jackson had made a "give or take" proposition to Perkins, and Perkins decided to "take."

On July 13, 1935, Perkins filed this suit in equity alleging that he was induced to and did enter into a contract with George Jackson through fraud, misrepresentation and deceit to purchase $1,400 worth of stock in the Barbourville Casket and Manufacturing Company at the sum of $100 per share. He further alleged that George Jackson had represented to him that his money would be used for the purpose of reorganizing the Company, and that instead of doing this the money was used to pay the debts of the old Company and not to promote the interest of the new one. Appellees answered, denying the allegation of fraud, and for further answer they pleaded the statute of limitations and set out also the fact that Jim Jackson had purchased Perkins' interest in the business in July, 1933. In his reply appellant admitted that he had executed some sort of an agreement with Jim Jackson for $124.57, but he denied that he knew at the time this agreement was entered into just what his interest in the Company was, or that appellees had perpetrated the fraud complained of.

On February 12, 1937, the trial court, on his own motion, appointed a special commissioner to hear the evidence and to make findings of fact and law and report the same to the court. On June 21, 1937, the commissioner made his report as directed by the court, recommending that appellant's petition be dismissed. The commissioner's report set out that appellant had voluntarily purchased an interest in the Barbourville Casket Company, and that if he failed properly to investigate

the solvency of the Company it was his own neglect. The report further set out that the commissioner was unable to ascertain the value of the interest in the Company which George Jackson purchased from Lay, and that there was no evidence of fraud. It was the conclusion of the commissioner that appellant's election to repudiate his contract was not seasonably made.

We have examined this record carefully with the view of determining whether there was any basis for the allegation of fraud on the part of appellant. While there is some conflict in the evidence as to what transpired between Perkins and George Jackson at the time he agreed to purchase an interest in the Casket Company, and while there is strong indication that the Jackson family got most of the benefits from it through wages drawn by them from the Company, we are forced to conclude that the judgment of the lower court, which was based upon the commissioner's report, should be affirmed. See Blackburn's Adm'x v. Union Bank & Trust Co., 269 Ky. 699, 108 S. W. (2d) 806; Hite's Adm'r v. Hite's Ex'r, 265 Ky. 786, 97 S. W. (2d) 811; Ream v. Fugate, 265 Ky. 463, 97 S. W. (2d) 11.

Perkins had ample opportunity to investigate this small concern before he invested his money in it in the first instance. According to his own testimony he thought things were not going right with the Company as early as January, 1931. Avenues were available to him at that time and thereafter for an accounting of the Company's affairs, but, as we have noted, even though George Jackson left the Company in January, 1931, it was not until June, 1935, that Perkins filed a petition in equity charging fraud purportedly to have been perpetrated upon him in the fall of 1930. Granting for the sake of argument, therefore, that George Jackson made fraudulent representations to Perkins at the time Perkins purchased an interest in the Barbourville Casket Company, we would be forced to conclude that Perkins' complaint was not seasonably made because of the rule that a party to a contract obtained by fraud has but one election to repudiate or rescind the same; and if he affirms the contract, as the evidence shows that Perkins did in the case at bar, his election is irrevocable and he condones the fraud. Mackenzie v. Eschmann's Ex'rs, 174 Ky. 450, 192 S. W. 521, and cases cited therein, and Cox v. Riggins, 223 Ky. 510, 4 S. W. (2d) 403.

We are constrained to hold, therefore, for the reasons given herein that the judgment of the lower court should be, and it is, affirmed.