## Barrowman Coal Corporation et al. v. Kentland Coal & Coke Co. et al.

May 31, 1946.

804

J. P. Hobson, Jr. for appellees.

Opinion of the Court by Stanley, Commissioner— Affirming.

The Kentland Coal & Coke Company, owners of the minerals, executed a mining lease of a certain 450 acres of coal at the head of the Left Fork of Beaver Creek, in Pike County, to the Barrowman Coal Corporation, on July 28, 1939. The property was about seven miles from a railroad and was to be developed as a trucking mine. The judgment declared that the rights and obligations of the parties under the lease had terminated and the plaintiffs had not shown themselves entitled to any rights under it. The judgment also denied recovery upon the counterclaim of the defendants of any damages for improper mining. We have an appeal and a cross appeal.

The duration of the lease was until the coal had been exhausted, which it appears might have been for as long as 60 years under the character of current operations. In May, 1943, the lessor, the Kentland Company, began negotiations with the lessee to modify the lease or execute a new one so as to reduce the acreage and embrace only the part being mined - and perhaps coal reasonably accessible to the present operating facilities. Eventually the lessee refused to agree. On August 2, 1943, the lessor notified the lessee that the lease had expired on June 10, 1943, because of the expiration of its corporate charter on that day. Reference was also made to the rejection of the offer to execute a new lease and reduce the boundary. The lessee was warned that continuance of operations would result in a suit to recover compensation for coal taken as by a wilful trespasser. Operations continued and remittances were made for rents and royalties for a brief time. They were not accepted as such but retained, as the lessor advised, to apply as credits on any sum that might be recovered for coal removed without right.

The stock of the Barrowman Coal Corporation, whose charter expired, was owned by David Barrowman, W. E. Barrowman and Annie B. Price. On July 8, 1943, 19 days after the date of expiration, articles of incorporation were filed for a new corporation of the identical name as the old, but with $25,000 capital stock instead of $200,000, which the old company had. It appears that these new articles had been prepared some time before the expiration of the charter, but nothing

was done toward amending the articles of the old company to extend its life beyond the 25 years ending June 10, 1943. After a few months following the notice and continued operations, a large part of the essential mining machinery and equipment was removed from the leasehold by the Barrowmans. The lessor regarded this as an abandonment and leased the land with mining rights to the Russell Fork Coal Company, which promptly constructed facilities and entered upon the mining of coal.

This suit was filed against the Kentland Company by the new Barrowman Coal Corporation and the three individuals who owned all the stock of both the old and the new companies. The old corporation was also named as a party plaintiff. The subsequent lessee, the Russell Fork Company, interpleaded. The petition does not allege that there was ever a transfer or assignment by either the old corporation or the stockholders to the new corporation, but it does allege that the new company was at all times ready, willing and able to proceed with the mining operations. The prayer was for a declaration of rights, including the adjudication that the new company be substituted as successor lessee.

It is doubtful whether the reason given in the notice or declaration of the termination of the lease could be sustained. Departing from the rule of the common law, that upon expiration of a charter real estate of the corporation reverted to the grantor and the personal property to the Crown, it became the American rule that after the satisfaction of debts title to a defunct corporation's property passes to the stockholders as owners in common or sometimes as partners. So that a lease to a corporation is not ipso facto extinguished or terminated by its dissolution. 32 Am. Jur., Landlord and Tenant, Sec. 827; Fletcher Cyclopedia of Corporations, Par. 8124; Cummington Realty Associates v. Whitten, 239 Mass. 313, 132 N. E. 53, 17 A. L. R. 527. Nor does such a dissolution give the lessor a right to regard it as an anticipatory breach of the contract. Perry v. Shaw, 152 Fla. 765, 13 So. 2d 811, 147 A. L. R. 352. We have recognized this rule as applicable to a mineral lease. Shadoin v. Sellars, 223 Ky. 751, 4 S. W. 2d 717. The doubt in this case arises from the fact that the lease contained very strong and specific provisions prohibit-

ing its assignment or transfer, or the parting with possession of the leasehold estate or of the rights created by the instrument, in whole or in part, without the previous consent of the lessor. It declared that such an assignment or transfer, or even the sale under judicial decree or the adjudication of the lessee as a bankrupt, would cause a forfeiture and authorize the lessor, at its option, to resume possession of the premises and all improvements thereon. We need not pursue the interesting question of the effect of such provisions on the right of the old corporation to dispose of the lease as an asset in the winding up of its affairs, or of the stockholders to receive the same as a distribution of assets and to hold the lease as partners, for it satisfactorily appears that the Barrowmans abandoned the lease and all rights they may have had as successors to the corporation. However, on June 10, 1945, a meeting of the former stockholders of the dissolved corporation was held for the purpose, as stated in the minutes, of ratifying the action taken by the stockholders and directors on July 10, 1943 (one month after the expiration of the charter), expressing the purpose of organizing a new corporation, and by a resolution then made (that is at this meeting) the stockholders undertook to assign the mineral lease to the new company. But there was never any claim that the lessor consented.

The plaintiffs have sought to recover their rights under the lease upon the ground that their surrender was procured by what is essentially deceit through concealment of material facts affecting the situation and the relation. That is, in brief, that the lessor knew all the time prior to seeking a modification of the lease and, of course, the giving of the notice of termination, while the lessee did not know, that a railroad was to be built up this fork of Beaver Creek, which would make the lease exceedingly valuable because of its proximity to the railroad. It is claimed that there was a conspiracy and collusion between the Kentland Company and the promoters of the railroad, some of whom incorporated the Russell Fork Coal Company and procured the subsequent lease of this coal property, to accomplish that end. It would seem to be a sufficient statement of the facts relied upon to say that in the latter part of 1942, Joseph Harris became interested in obtaining coal leases

in this area with a view of inaugurating development on a scale large enough to justify a railroad being built to serve it. Early in his investigations he had visited the Barrowman mine and was given whatever information he desired about it. He pursued his inquiries with the Kentland Company, which owned other mineral rights in a large area. According to Harris, he was told that the Barrowmans had no lease and were operating by sufferance. Perhaps this was because the company was claiming, or later claimed, that the lessee was not properly conducting its operations or mining the property. It may well be concluded that this inquiry and the knowledge acquired of Harris' project was what induced the negotiations looking to the reduction in the area covered by the Barrowman lease, and also the notice of termination. The appellees sought to justify their failure to inform the Barrowman Company of what was going on by saying that the project was then only a possibility or in the promotion stage, and there was no assurance that a railroad company would build a spur up Beaver Creek instead of Ferrells Creek, or would build it at all. They contend that any statement as to the building of the spur track would have been merely prophetic, and that since an affirmative statement of that character is not regarded as a fraud if false, it follows that a failure to make such a statement which would become true eventually cannot as a matter of course be deemed a fraud. They further say that they were under no legal obligation to make such disclosure. Whether legally justifiable or not, or whether there was in fact an unlawful concealment of the situation from the Barrowman Company, are questions we need not decide. The fact remains that it was not long after the closing down of their operations and removal of their machinery and equipment before the Barrowmans learned of the building of the railroad and saw it being constructed during a period of eleven months. After the lease of the property to the Russell Fork Company, they stood by and saw it spend a large sum of money in the erection of operating facilities and yet took no action for nearly two years to assert an adverse right. It should be said, however, that the installations and the expenditure of $400,000, as claimed by the Russell Fork Coal Company, were not upon or for this particular tract of coal alone, but were for the company's entire acreage, including it. But the develop-

ment was made, in part, in reliance upon its lease of this tract, and it was not until its operations in stripping the overburden neared this property that the Barrowmans sought by legal processes to rescind their abandonment of the lease. Should they now be permitted to upset all this in order to recover what they surrendered when they accepted the notice of the termination of the lease or by acquiescing in the construction of its terms by the lessor, which may or may not have been sustainable in law? The question could have been saved by extending the life of the lessee corporation by simply amending its charter before it expired. Response to this inquiry may well be made in the language of Culton v. Asher, 149 Ky. 659, 149 S. W. 946, 949, namely:

"No equitable doctrine is better settled than that which requires a plaintiff, who seeks relief from a fraud perpetrated upon him, to promptly make his election between an approval and a disapproval of the fraudulent acts, and to bring his action promptly in case he disapproves them. He will not be allowed to wait and speculate upon the probabilities of the case. Mr. Bispham, in section 260 of his excellent work on Equity, says: 'A person who is injured by fraud must be prompt in seeking redress, and he must prosecute his suit with diligence. Laches and negligence are always discountenanced. Nothing can call a court of chancery into activity, but conscience, good faith, and reasonable diligence, and, when these are wanting, the court is passive, and does nothing. A court of equity does not encourage stale claims, and a party may lose his right to complain of a fraud by his delay. * * * In many cases courts of equity have taken the statutes of limitations as standards by which to measure the time properly allowable for the assertion of an equitable right. But this is by analogy only, and chancery tribunals will not hesitate to apply their own doctrines, as to delay, whenever the circumstances of the case require it.' See Allore v. Jewell, 94 U. S. (506), 512, 24 L. Ed. 260."

A court of equity will refuse its aid and decline to give relief where a party has slept on his rights or has failed to exercise reasonable diligence, during which period of slumber material changes in conditions or the relations of the parties were induced or resulted, and where it would be unjust and inequitable to the adverse

party to disturb the status quo thus created. As said in Dolle v. Melrose Properties, 252 Ky. 482, 67 S. W. 2d 706, 710, where rescission of a contract was sought by the plaintiff upon the ground of fraud and misrepresentation:

"It was his duty to exercise promptly his right of election to rescind for such causes, as soon as he obtained knowledge of the fraud, whether the contract was an executed or an executory one. The right to rescind because of fraud or fraudulent representation must be asserted promptly. (Citations.) Rescission is a remedy awarded only to the diligent."

This text is fully sustained by Section 917 Pomeroy's Equity Jurisprudence, where it is said, in reference to the principles that transactions are only voidable, and not void, because of fraud and there must be an election to repudiate or to ratify, that the most important practical consequence is the requisite of promptness in asserting his remedial rights after a party has obtained knowledge of the fraud or of facts and circumstances from which knowledge would be imputed. "What constitutes reasonable diligence can be determined by no established rule, for the question must be determined upon the circumstances of each case. What may be inexcusable delay in one case will not be inconsistent with diligence in another." Pomeroy, Section 419c. Time is only one element in the doctrine of laches. In some cases it is the prime or controlling element, e. g., in the assertion of a long standing claim that has become stale through the passing of the years, with a loss of evidence or obscuration of the facts. In other cases, as in this one, the lapse of time may be brief, but the injurious consequences of the delay may be great. Here the parties have spent much money and created conditions so materially different that the granting of relief to the suitor would be devastating and result in gross injustice to one taken unawares.

As a shield against this defensive plea of laches, which is bottomed upon the maxim, "Equity aids the vigilant, not those who have slept on their rights," the appellants invoke the maxims, "He who comes into equity must come with clean hands," and "He who seeks equity must do equity." The argument is that as the appellees were shown to have been guilty of fraudulent

concealment, they may not set up an equitable estoppel. The assertion of this principle as a counter-defense is quite novel. No authority is cited in support. These maxims are applicable to a party who seeks the aid of the court of equity to extricate himself from a position created by his own wrong or to get what he claims is a just remedy. It is he who "comes" and he who "seeks" affirmative relief who is denied it when he is himself guilty of inequitable or unconscionable conduct in relation to the transaction. In discussing the general meaning of these maxims, Pomeroy, Sec. 397, says:

"In applying the maxim, He who seeks equity must do equity, it is necessarily assumed that different equitable rights have arisen from the same subject-matter or transaction, some in favor of the plaintiff and some of the defendant; and the maxim requires that the court should, as the price or condition of its enforcing the plaintiff's equity and conferring a remedy upon him, compel him to recognize, admit, and provide for the corresponding equity of the defendant, and award to him also the proper relief. The maxim does not assume that the plaintiff has done anything unconscientious or inequitable; much less does it refuse to him all relief; on the contrary, it grants to him the remedy to which he is entitled, but upon condition that the defendant's equitable rights are protected by means of the remedy to which he is entitled. On the other hand, the maxim now under consideration, He who comes into equity must come with clean hands, is much more efficient and restrictive in its operation. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party, who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."

In this case the defendants, now appellees, did not come into court seeking relief. They were brought in.

They did not seek to change the status. Where both parties have been guilty of inequitable conduct in relation to a transaction, the court will leave them in the position in which they have placed themselves and will grant relief to neither by refusing all affirmative aid. "The only equitable remedies which they can obtain are purely defensive." Pomeroy, Section 401.

The argument advanced by the appellants is refuted by the uniform application of the rule of laches. If sustained it would destroy or make that rule ineffective in many cases, for it is universally recognized that laches may bar rescission of a transaction entered into by reason of the fraud of the defendant. We do have a case in which one of these appellees, as a plaintiff, invoked the maxim "Equity aids the vigilant" against a defendant who claimed its agent had fraudulently obtained a quit-claim deed from him. We denied the plaintiff's right to rely upon the principle under the qualification that one seeking to take advantage of it must be free from fault, as it was shown that the plaintiff had lulled its adversary, the defendant, into repose and thereby obstructed and prevented vigilance on his part. Kentland Coal & Coke Company v. Elswick, 167 Ky. 593, 181 S. W. 181. In that case there was a counter-balance of cause and effect. The application is different here. The original wrong of the defendant can not serve to excuse inaction or laches of the plaintiff. It is illogical to say that the gravamen of the suit, although an unclean and wrongful act, deprives the court of the power to withhold relief to the other party because of the inequitable delay of the one who invokes the exercise of the power. "He that hath committed iniquity shall not have equity" is another form of the maxim here invoked by the appellants. One who is guilty of laches "hath committed iniquity" himself and will not be heard in his petition for affirmative relief where his "iniquity" was not caused by the other party. Wherefore, this point is not sustainable and the appellees are not deprived of the right to insist upon the appellants' laches as a bar to rescission.

The counterclaim, the denial of which produces the cross appeal, was for $7,304.55 for damages to the property of the Kentland Coal & Coke Company resulting from the negligent and improper manner in which the

former lessee, the dissolved Barrowman Coal Corporation, had operated the mine. It is charged that by reason thereof large quantities of coal were lost. It is further charged that that company left the mine in such condition upon cessation of operation that the mine was further injured. The evidence on these issues is conflicting and we are not persuaded that the chancellor erred in denying damages.

Wherefore, the judgment is affirmed on both original and cross appeal.