**F. W. HAMPTON, Appellant,**

**v.**

**June L. SUTER, Appellee.**

Court of Appeals of Kentucky.

Dec. 18, 1959.

———————

Vest & Vest, Walton, Harlan Heilman, Carrollton, Robert E. Grubbs, Louisville, for appellant.

L. M. Ackman, Williamstown, F. S. Connely, Warsaw, for appellee.

STANLEY, Commissioner.

This is a suit by F. W. Hampton against June L. Suter seeking to set aside on the ground of fraud and deceit a contract of purchase by Hampton of an automobile garage and agency and to recover $35,000 damages. Relief from a promissory note and other incidentals of the transaction were prayed. Suter defended the virtue and legality of the sale and incidental transactions, pleaded res judicata and counterclaimed a recovery of a considerable sum made up of diverse items. After an extended trial, Honorable John A. Keck, as a special judge of the Gallatin Circuit Court, filed a statement of findings of fact and conclusions of law and thereupon dismissed the complaint and the counterclaim in part. He adjudged there should be an accounting to establish whether there are "dealers reserves" to which the defendant, Suter, may be entitled from the operation of the Buick and other General Motors Company agencies and an accounting to ascertain proper credits to be allowed Suter. Hampton prosecutes an appeal.

The record is a large one. Some of it is of little significance and some relates to issues not presented on the appeal. We deem an abridged narrative of the whole evidence with some conclusions from testimony not narrated to be sufficient without reciting many particular items of evidence. The major grounds of deceit alleged are as to the previous year's profits of the business and to the assignment of an agency or franchise for dealing in Buick automobiles.

There appeared in the Louisville Courier Journal on February 8, 1953, the following "For Sale" advertisement:

"Buick agency, GMC truck agency and Fridgidaire agency in the county seat of one of Kentucky's most prosperous counties; well established; owner's health forces sale of this highly profitable business; owner has been ill the last year and under the direction of a manager, the business still showed a profit for 1952 of approximately $20,000; opportunity of a lifetime; terms can be arranged to a responsible party. Call Mr. McCardwell, CA 2220 or AR 9272. McCardwell Realty Co."

Hampton lived in Louisville and was without experience in the automobile business. Suter had operated this business for 20 years under the name of June L. Suter Motor Company. Hampton responded to the advertisement and went to Warsaw with McCardwell to see Suter.

Following continuing discussions and transactions, principally relating to the Buick agency, which we pass for the present, on March 9, 1953, the parties signed a contract of sale and purchase which was prepared by Suter's lawyer by which Suter sold the equipment, tools, stock, etc., in the building for $30,000, of which $20,000 was cash and the balance a note for $10,000. The Buick and other franchises are not mentioned. On the same day Hampton leased the garage building from Suter for a period of five years at $250 a month. The stock and other personal property covered by the contract inventoried at only $15,255. The difference between that and $30,000 is very persuasive that the transfer of the agencies or franchises was the most mate-

rial consideration for the transaction. The "agency" is what was advertised as being for sale.

Hampton took over the operation of the garage and continued in the business for about six months. When the Buick agency had been terminated, as hereinafter described, the business was liquidated and on December 26, 1953, Hampton filed this action.

Hampton testified that during the negotiations Suter asserted the business had shown approximately $20,000 in profits in 1952, as was stated in the advertisement. Suter testified he told Hampton he believed the business had earned between $10,000 and $15,000. It is not clear whether Suter gave his books to Hampton to examine or only said that he would be willing to have them audited and make the books available for that purpose. After the transaction had failed, an audit was made and it revealed the profits in 1952 had been only $10,933.51.

We believe Hampton was deceived as to the profits made in the previous year, but believe he had ample opportunity to learn from the books what the profits were; and not long afterward he did definitely learn the real fact. He was then put upon an election to abide by the contract and condone the deceit or to act with reasonable promptness to repudiate and seek to rescind the trade. But he retained and operated the business for some time after he learned or had ample opportunity to learn the true state of facts. Hampton is chargeable with having made an election to abide by the contract, so far as concerns that misrepresentation. Having once determined such an election, he could not thereafter be relieved of the obligations placed upon him by the terms of the contract, although such an election does not ordinarily deprive one of a right to claim damages. Dunn v. Tate, Ky., 268 S.W.2d 925.

The Buick agency was the profitable part of the business and its transfer the paramount consideration for the purchase.

In respect thereto Hampton's evidence in brief substance is that during the preliminary negotiations he was assured by both Suter and his agent, McCardwell, that the automobile franchise could be and would be assigned to him; and having no reason to believe otherwise, he relied upon those assurances. The other agencies advertised for sale seem to have been lost sight of or were regarded as included in the Buick agency.

On March 5 (five days before the contract of sale and purchase was executed) Suter and Hampton went to Cincinnati together to see the zone manager of the Buick company for the purpose, as Hampton says, of having the franchise transferred. On this occasion the manager stipulated several requirements that would have to be met. Hampton and Suter left Cincinnati believing the conditions had been and would be met, and that everything would be all right, and that there remained only the matter of references, which Hampton later supplied. Relying on these assurances, and feeling that the transfer would be approved by Buick, Hampton executed the contract of March 10.

Suter's testimony is to the effect that he did not agree with Hampton to sell him the Buick contract and had told him that the franchise could not be sold and could not be transferred without the approval of the company, but that he, Suter, would be glad to aid Hampton in any way he could to get that approval. The advertisement of sale, all the circumstances and future developments sustain Hampton's version that it was otherwise. We believe there was a clear understanding that the purchase of the business was contingent upon the assignment or transfer of the Buick franchise. But Hampton soon learned that it could not be done without the approval of the Buick Company.

Suter, upon return from another trip to Cincinnati and discussion with the Buick manager, according to Hampton, assured Hampton "it has been worked out to Buick's

satisfaction." This is not denied. This was a misrepresentation of a fact as distinguished from an expression of opinion. If this were all and it was acted upon by Hampton, it would authorize a rescission or damages. Kentucky Electric Development Co.'s Receiver v. Head, 252 Ky. 656, 68 S.W.2d 1.

But on April 14, the Buick manager came to Warsaw and informed Hampton and Suter that he had decided that if Suter did not operate the garage, the agency would be closed. It is not shown why Buick departed from its apparent agreement to the transfer upon Hampton's meeting the conditions laid down—as he seems to have substantially done. Suter again assured Hampton everything would be all right. Upon return from another trip to see the Buick people, Suter reported the Buick manager had suggested as a method of keeping a dealer in Warsaw that they enter into a partnership. The parties went to Cincinnati and Buick did agree to the partnership but with the understanding that the agency would remain active only as long as Suter continued in the business. This was confirmed by a letter, dated May 12, 1953, addressed to the company, then and there drafted by the Buick manager and signed by Hampton. It recited that it was with the full understanding of these terms and that he, Hampton, was buying a 40 per cent interest in the June L. Suter Motor Company.

Suter and Hampton had no intention of forming a partnership. Hampton testified he had been assured by Suter that the Buick people had approved of the fictitious scheme. It seems certain that Suter was anxious that the deal not fail or be rescinded by Hampton. We believe that it was Suter who actively deceived the Buick people and that he lulled Hampton into going on with the transaction when otherwise failure of consideration would have been claimed.

The parties met at the office of Suter's attorney where an ostensible partnership agreement was drafted and executed on May 14, 1953.[1] The preamble or "Whereas" clauses of the paper, among other things, referred to the contract of sale on March 9th, the delivery of possession of the garage to Hampton, and recited that it was intended that "F. W. Hampton continue as the authorized Buick dealer at said location." It stated that in order to carry out that intention the parties had been negotiating with Buick "hoping to qualify" Hampton as a dealer, but that he was unable to meet the terms. It was further recited that in order to enable the June L. Suter Motor Company to continue as the authorized Buick dealer, the parties had on May 12, 1953, executed and delivered to Buick a dealer's agreement "wherein it is set out and understood and agreed by the parties hereto that insofar as" the Buick Division of General Motors Corporation was concerned, Suter "is a partner controlling sixty per cent interest and F. W. Hampton is a partner controlling a forty per cent interest" in the Motor Company; that Buick had required that Suter use his established credit with Buick; and the parties had been unable to induce Buick to agree to any other plan for dealership. The instrument, following the preamble, recited: "Now, therefore" the partnership was formed between the two men. . It contained certain agreements and commitments respecting the agency and Suter's credit.

Following the execution of the agreement, Buick wrote the motor company on May 20 advising it that because of the change in ownership and financial interests, a new selling agreement was in force.

The operation of the garage went along and the sale of automobiles continued. Hampton put around $22,000 more into the business. He borrowed the money from his uncle and on a mortgage of the garage inventory. Suter permitted his credit to be used at the local bank by the June L. Suter Motor Company. He continued some little activity around the garage assisting Hampton.

---

1. It is fair to say the attorney knew nothing about its fictitious character.

The partnership agreement, as stated, was a sham.

Along about October, following, trouble arose between Suter and Hampton. Hampton's uncle, W. L. Hampton, testified that in October, 1953, he asked Suter if he would take the business back and allow his nephew to get out with a loss of $10,000 and avoid a lawsuit, and Suter refused to do so. We do not find that Suter denied this. There is contradictory evidence concerning rejected offers by both parties to rescind. But it seems quite certain Suter's offer carried the condition that Hampton should lose $1,500 paid to the real estate agent.

After Suter sued Hampton, Hampton went to Cincinnati and inquired of the Buick manager if he knew the true facts and informed the Buick manager that the partnership was fictitious. On October 30 the Buick company wrote the June L. Suter Motor Company that it had come to their attention that Suter had no financial interest in the company, and, "This is a gross misrepresentation of the facts since on May 12, 1953, and on September 30, 1953, said Mr. Suter reported to us that he owned 60% of the June L. Suter Motor Company." The Suter company was then notified that the selling agreement would expire October 31 and because of the misrepresentation of the ownership Buick would not offer a new selling agreement and its status as an authorized dealer would terminate.

A few days later Suter sued Hampton on a note and for receivership of the business on the ground its continuance created liabilities and impaired his credit. In February, 1954, Hampton sold everything he had in the garage and sent the keys to the building to Suter. The business was liquidated and the present suit was filed by Hampton.

In respect to the sham partnership transaction, Hampton's counsel concede he was in delicto but argue that he was not equally guilty, or in pari delicto, in misrepresenting the status of their relation to Buick. In any event, so the argument runs, the court is not now concerned with the deceit of Buick, for the issue is the deceit or absence of deceit by Suter. The deceit of Buick was what permitted Hampton to continue the franchise. When deceit was discovered by Buick, the house fell in and the loss occurred.

The trial court expressed the opinion that the only fraud appearing in the case was that perpetrated upon Buick; but even if there were other fraud by Suter, Hampton soon learned the real facts, and he was willing to and did confirm the deal by entering into this agreement.

■ Fraud inducing a contract may be waived by affirmance that is equivalent to ratification of the contract by the party who claimed to have been deceived into entering into it. That ratification may be shown by his acts after he acquired full knowledge of the real facts and had shown a clear intent to affirm the contract despite the fraud, as where he accepted the benefits thereof or acted in a manner inconsistent with repudiation. The intention may be in part shown by a failure to act promptly to repudiate the transaction. 17 C.J.S. Contracts § 165b; 24 Am.Jur., Fraud and Deceit, § 209; Cox v. Riggins, 223 Ky. 510, 4 S.W.2d 403; Gargotto v. Sherman, 297 Ky. 597, 180 S.W.2d 565; Barrowman Coal Corp. v. Kentland Coal & Coke Co., 302 Ky. 803, 196 S.W.2d 428.

■ Ordinarily, one claiming to have been defrauded into making a contract has an option either to disaffirm the contract and seek its rescission or to affirm the contract and seek his remedy by an action for damages; he may not follow inconsistent remedies. Webb v. Verkamp Corp., Ky., 254 S.W.2d 717. He has but one election, and if he affirms the contract, his election is irrevocable and he condones the fraud. Perkins v. Jackson, 276 Ky. 217, 123 S.W.2d 247. The inconsistency of the prayer of the complaint in the instant case does not seem to have been challenged.

It is readily apparent that the plaintiff was not entitled to a rescission of the contract, for he did not move promptly and was unable to restore the consideration for the contract, or the status quo ante of the business purchased. So, we are concerned only with the question of whether or not the plaintiff was entitled to a judgment for damages by the court or the submission of the issue to a jury on the ground of failure of consideration.

■■ The rule of waiver of fraud and ratification of a contract may be applicable to an action for damages for breach of the contract as well as to a suit to rescind. Hampton accepted the fraudulently induced contract relating to the Buick agency as fulfilling the consideration requirement and could not await the result of the adventure and then repudiate it. In Summers v. Carpenter, 156 Ky. 337, 160 S.W. 1064, it was held that a party claiming to have been induced by fraud to enter into a contract of purchase of property had waived his right of action for damages by his acts and conduct after having discovered the alleged fraud.

Upon the whole case the court is of opinion that the judgment should be and it is

Affirmed.