106 F.3d 402
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Nick THOMAS and Barbara Thomas, Plaintiffs-Appellants, Cross-Appellees,
v.
Joan HAMILTON, Defendant-Appellee, Cross-Appellant,
and
Larry Hodge; Paul Hamilton; First and Peoples Bank,
Springfield, Kentucky, Defendants-Appellees.
 Nos. 95-5879, 95-6329.
 United States Court of Appeals, Sixth Circuit.
 Jan. 27, 1997.
 
 Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.
 SILER, Circuit Judge.
 
 
 1
 Plaintiffs, Nick and Barbara Thomas, husband and wife ("Thomases"), appeal and defendant, Joan Hamilton ("Joan"), cross-appeals the directed verdict for some defendants in this diversity fraud action and the jury award of damages against some defendants (including Joan). This case involves the boarding and sales of horses. Numerous issues have been raised. The Thomases claim alleged errors by the district court in: (1) failing to enforce an order for an accounting; (2) overlooking Joan's gain from the sale of a horse; (3) excluding testimony of plaintiffs' expert witness; (4) refusing to amend the jury verdict; (5) directing a verdict for the defendant bank; and (6) failing to include all defendants in the fraud and exemplary damages instructions to the jury. Joan asserts that the district court erred by: (1) improperly instructing the jury concerning the transfer of a mare and foals; (2) failing to direct a verdict in her favor; and (3) failing to grant her a set-off for services rendered to the plaintiffs. Joan also contends that the jury's finding that she wrongfully transferred the mare and foals was erroneous. For the reasons stated herein, we AFFIRM.
 
 I. Facts
 
 2
 The Thomases are residents of Malibu, California. Both have a longstanding history of buying and showing saddlebred horses. In 1983, the couple became acquainted with defendant, Larry Hodge, a professional horse trainer and sales agent who resides in Springfield, Kentucky.
 
 
 3
 Hodge leases property from defendant, Paul Hamilton, to conduct his horse training and sales business known as Kalarama Farm. On adjacent property, Paul owns a business designated Kalarama Stud, which his daughter, Joan, operates to board and breed saddlebred horses. Kalarama Farm and Kalarama Stud are separate businesses. Since the early 1980s, Hodge has bought, sold, and trained horses for the Thomases. The horses were boarded at Kalarama Stud.
 
 
 4
 Hodge was involved in a number of horse purchase and sale transactions with the Thomases. The transactions at issue in this case include: the purchase of "I Prefer Gold," "Arista," "The Foxchaser," "Harlem's Sweet Lou Dunbar," and "Champagne Heiress"; the sale of "The Biltmore" and "Marilyn McCoo"; and the transfer of "Harlem's Apollo." With respect to each of these transactions, Hodge acted either as the Thomases' agent, the trainer of the horse, or the owner/seller of the horse.
 
 
 5
 In the summer of 1989, the Thomases began to experience financial difficulties. In October 1989, defendant, First and Peoples Bank ("Bank"), loaned them $400,000 for one year on the condition that Paul Hamilton would buy the horses offered as collateral in the event of default ("1989 Agreement"). Also, the 1989 Agreement established a procedure for appraisal and sale of the equine collateral. Paul agreed to purchase the horses as necessary to permit the Bank to recoup its loan, interest, costs, and attorney's fees.
 
 
 6
 The Thomases defaulted on the loan one year later. The Bank then notified them that it intended to pursue its remedies under the loan agreement to recover the remaining unpaid balance of approximately $200,000. On November 9, 1990, the Thomases received notice of the average appraised values for the remaining horses based upon the appraisals submitted by the Bank and Paul Hamilton. Although they were notified about the deadline for selecting their own appraiser consistent with the 1989 Agreement terms, the Thomases took no steps to obtain an independent appraisal nor did they complain about the appraisal values.
 
 
 7
 In early December 1990, Hodge and Joan Hamilton visited the Thomases in Malibu to present a new agreement ("1990 Agreement") prepared by the Bank. Joan told the Thomases that the new agreement would allow them more time to try to sell the horses privately and thus avoid an immediate sale by the Bank. The 1990 Agreement extended the time to pay off the loan until March 1, 1991. In the agreement, Hodge was named the Bank's exclusive agent for the purpose of soliciting and accepting offers for the private sale of collateral. The Thomases acknowledged in the agreement that the collateral was impaired by outstanding board and maintenance bills owed to Kalarama Stud and Kalarama Farm. It was further agreed that the proceeds from the sale of any collateral would be applied to these debts as well as to the principal and interest owed to the Bank. Although they did not read the 1990 Agreement, the Thomases signed it in California on December 3, 1990. After later reading the agreement, the Thomases did not complain. Nick would later say in deposition that he "didn't care." Barbara simply felt that it was "too late to do anything."
 
 
 8
 By the end of February 1991, all of the horses had been sold. Four foals and a mare, "Shea Tremendous," were transferred to Joan Hamilton. Hodge sold "Champagne Lady" for $20,000 and applied the proceeds to outstanding board bills and his commission. The remaining horses were sold to Paul Hamilton at Kalarama Stud for $391,140 or 96.15% of their respective appraised values. The proceeds of the sales satisfied the board and training bills and the outstanding debt with the Bank. No funds remained to be paid over to the Thomases.
 
 
 9
 In less than thirty days, the Thomases' attorney sent letters to the Bank, Hodge, and Paul explaining that the Thomases had questions about how the horses had been appraised and sold. Subsequently, on September 9, 1991, the Thomases filed the instant suit alleging numerous counts of fraud, breach of fiduciary duty, and failure to account. At trial, directed verdicts were entered on behalf of several defendants. At the conclusion of the trial, Hodge and Joan were found to have breached their fiduciary duties with respect to certain transactions. The Thomases unsuccessfully made several post-trial motions.
 
 II. Thomases' Appeal
 A. Accounting
 
 10
 On appeal, the Thomases argue that Hodge never gave a proper accounting as ordered by the district court. Dissatisfied with the documents produced by Hodge pursuant to the order of accounting, the Thomases filed a motion for partial summary judgment against Hodge on February 17, 1995. Judge Heyburn considered the matter and concluded that Hodge's accounting was sufficient. Thomas v. Hodge, 897 F.Supp. 980, 984 (W.D.Ky.1995). The Thomases have presented no evidence to the contrary. Judge Heyburn, in his well-reasoned, fact-intensive analysis, concluded that Hodge did act as an agent, and thus in a fiduciary capacity, when he bought or sold horses on behalf of the Thomases. Hodge had a duty to account on those occasions. An accounting was given and Judge Heyburn did not err in his findings.
 
 B. Benefit Judgment
 
 11
 Next, the Thomases assert that the district court erred by not granting a benefit judgment against Joan for "Tres Shea," one of the foals transferred to her in 1991. In the instant appeal, the Thomases have claimed that on May 5, 1995, they learned that Joan resold "Tres Shea" for $70,000 on April 9, 1993, just over two years after she had acquired it. They now claim that they are entitled to this amount. They cite Sanford Construction Co. v. S & H Contractors, Inc., 443 S.W.2d 227, 236 (Ky.1969), for the proposition that once full knowledge of the real facts is acquired, a party can elect to receive a benefit remedy. However, Sanford does not support this proposition. Moreover, the Thomases cite no Kentucky decision supporting their argument.
 
 
 12
 The Thomases originally alleged that the defendants, including Joan, conspired to acquire all of the horses in question without paying by filling in the names of the horses on blank transfer forms already signed by the Thomases and entrusted to Joan. At trial, Joan denied any wrongdoing with respect to the forms, but the jury found Joan liable in damages for $15,000. There is no reason to modify that judgment at this stage. At the time of original transfer, Joan only received a foal valued at $1750. The Thomases have cited no law that supports awarding them the amount Joan gained upon the later sale of the horse after Joan had boarded and trained the animal for two years. Thus, the district court did not err.
 
 C. Expert Testimony
 
 13
 The Thomases also complain that the district court committed error in excluding the testimony of the Thomases' expert. This expert purportedly would have testified that the Thomases either paid too much or received too little for every horse bought or sold. Judge Heyburn excluded the purported testimony, noting that "[s]uch evidence would not be relevant" because of both the 1989 and 1990 Agreements, which promulgated a binding appraisal process for the horses. Such relevancy determinations are reviewed for an abuse of discretion. Cook v. American S.S. Co., 53 F.3d 733, 738 (6th Cir.1995).
 
 
 14
 The Thomases have not shown that the district court abused its discretion. They focus their argument on credibility, which was not the reason for the exclusion. Rather, the two agreements set forth the method to appraise the horses, and the Thomases were given every opportunity to participate in the process. By their failure to act, they waived their right to select an appraiser. Thus, any after-the-fact testimony as to the value of the horses would indeed be irrelevant. Therefore, there was no abuse of discretion.
 
 D. Respondent Superior
 
 15
 The Thomases also urge this court to reverse the district court's decision not to amend the jury verdict to reflect liability for Paul on the basis of respondent superior. Earlier, the district court intimated that Paul might possibly be liable under such a theory. Upon the close of the trial, the jury decided that Joan had breached her fiduciary duty to the Thomases. Paul, however, was not named in the judgment. Subsequently, the Thomases filed a motion requesting the court to alter or amend the judgment to include Paul. The court declined, explaining that because it had not "instruct[ed] the jury to consider the liability of Paul.... Plaintiffs [we]re not entitled to judgment against [him]."
 
 
 16
 "No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." FED.R.CIV.P. 51. Moreover, without a factual finding that Joan's unlawful transfer was performed in the course of her employment at Kalarama Stud as Paul's agent, the court could not amend the verdict to enter judgment against Paul. Thus, no error was committed regarding this matter.
 
 E. Bank's Liability
 
 17
 The Thomases also maintain that the district court erred in granting a directed verdict in favor of the Bank because: (1) the Bank's relationship to the Thomases purportedly triggered a fiduciary relationship; (2) the Bank allegedly was responsible for Hodge's fraud in the execution of the 1990 Agreement; and (3) the Bank ostensibly did not comply with the appraisal process.
 
 
 18
 First, there was no fiduciary relationship between the Bank and the Thomases. The Thomases argue that Steelvest, Inc. v. Scansteel Serv. Crt., 807 S.W.2d 476 (Ky.1991), suggests otherwise. The district court, cognizant of this case, expressly found that, prior to the 1990 Agreement, the evidence did not disclose "any special relationship or confidences between the Bank and Plaintiffs that would impose a fiduciary duty upon the Bank."
 
 
 19
 Although the district court agreed that a fiduciary duty attached to the Bank once the 1990 Agreement was signed (because "the Bank was assigned Plaintiffs' right, title, and interest in the [equine] collateral and appointed as Plaintiffs' Attorney-in-Fact for executing documents necessary to effectuate the sale and transfer of ownership of the collateral"), it noted that the Thomases never alleged in the complaint that the Bank breached its fiduciary duty. Rather, the Thomases only asked for an accounting from the Bank pursuant to their fiduciary relationship. Consequently, the district court found that no cause of action remained for the trial and issued a directed verdict. The Thomases have proven no error in this ruling.
 
 
 20
 Second, the Thomases also contend that the Bank is somehow responsible for the fraudulent conduct of Hodge because the Bank allegedly appointed Hodge as its "agent to induce the Thomases to sign the 1990 Agreement." There are at least four problems with this analysis. First, after hearing all of the evidence, the district court granted Hodge a directed verdict on the fraudulent inducement issue, thus concluding that there was no fraud. Second, the Thomases did not show any damage from their ratification of the 1990 Agreement (arguably it only helped them). Third, proof of an agency relationship between the Bank and Hodge was lacking. Fourth, "[f]raud inducing a contract may be waived by ... ratification of the contract." Hampton v. Suter, 330 S.W.2d 402, 406 (Ky.1959).
 
 
 21
 Third, the Thomases claim that the Bank failed to comply with the appraisal process promulgated in the 1989 Agreement. They complain that the Bank somehow cheated them when, after it had submitted its own appraisals, it allegedly informed the Thomases that it was too late for them to submit their own appraisal. This was not the case, and the Thomases had ample opportunity to participate in the appraisal process. They were given timely notice and chose to remain silent. By not participating and not complaining they waived their right to select an appraiser. See Stamper v. Ford's Adm'x, 260 S.W.2d 942 (Ky.1953) ("A party may waive or relinquish rights to which he is entitled under a contract, and having done so may not reverse his position to the prejudice of another party to the contract.").
 
 F. Instructions
 
 22
 Finally, the Thomases argue that the district court erred in refusing to include all of the defendants in the fraud and exemplary damage instructions. However, the Thomases did not offer proof at trial that would support a claim of punitive damages against the other defendants. Moreover, the Thomases, on appeal, cite to nothing in the law or record to allow this court to review the assignment of error. FED.R.APP.P. 28(a)(6).
 
 III. Joan's Appeal
 
 23
 Joan Hamilton makes several arguments on cross-appeal. First, she argues that her relationship with the Thomases was a bailment and did not give rise to a fiduciary duty. Concerning the bulk of the transactions between Joan and the Thomases, she is correct. However, for the one transaction concerning "Shea Tremedous" and the four foals, the district court found that Joan had been entrusted with the Thomases' transfer papers, creating a fiduciary duty to protect the papers from fraud or abuse. Consequently, the fiduciary duty instruction, with regard to this transaction, is not erroneous.
 
 
 24
 Next, Joan claims that she was entitled to a directed verdict because the Thomases suffered no damages. Based upon her assertion that she owed plaintiffs no fiduciary duty, she alleges that her legal liability would be for conversion only. "[T]he measure of damages in conversion is the value of the property at the time of conversion...." State Auto. Mut. Ins. Co. v. Chrysler Credit Corp., 792 S.W.2d 626, 627 (Ky.Ct.App.1990). The proof at trial showed that Joan gave the Thomases a $14,000 credit on their bill at Kalarama Stud. Joan testified that this $14,000 was based on the recent appraisals of the horses. Thus, according to Joan, at the time of the transfer, the Thomases received the fair market value of the horses and suffered no damages. Because this argument is premised on the assumption that there was no fiduciary duty and because it relies solely on Joan's testimony, it is not sufficient to overcome the district court's denial of a directed verdict.
 
 
 25
 Next, Joan argues that even if the denial of a directed verdict was proper, the court should have instructed the jury to set off the damages award with the $14,000 credit that she applied to the Thomases' Kalarama Stud account. In fact, the jury was reminded of the "$14,000 credit" and permitted to "award an amount that reasonably compensates Plaintiffs for the loss caused by the defendant's conduct." Thus, there was no error in the instructions. Moreover, this new argument cannot be raised on appeal because it was not preserved below. See FED.R.CIV.P. 51.
 
 
 26
 Finally, Joan contends that the jury's determination that she wrongfully transferred the mare and four foals was clearly erroneous. This question was rightfully reserved for the jury, and the jury's decision was not clearly erroneous. Admittedly, the district court "judge stated several times ... that the handwriting looked like Nick's," outside the presence of the jury. Also, as Joan argues, appellate courts "should not ignore their responsibility to insure that the evidence presented at trial permits juries to draw the reasonable inferences supporting such determinations." J.C. Wychoff & Assocs. v. Standard Fire Ins. Co., 936 F.2d 1474, 1482 (6th Cir.1991). However, a jury's verdict is not erroneous merely because it contradicts the trial judge's factual belief, not expressed to the jury, nor is the judge obliged to make his opinion known to the jury. Furthermore, findings of fact by the jury are entitled to great deference and will not be disturbed unless clearly erroneous. Joan has not demonstrated that the jury's verdict was clearly erroneous.
 
 
 27
 AFFIRMED.