RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

NEW LONDON TOBACCO MARKET, INC.; FIVEMILE
ENERGY, LLC,

        *Plaintiffs-Appellees*,

   *v.*

KENTUCKY FUEL CORPORATION; JAMES C. JUSTICE
COMPANIES, INC.,

        *Defendants-Appellants*,

THE GETTY LAW GROUP, PLLC; RICHARD A. GETTY,

        *Interested Parties*.

No. 20-5565

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:12-cv-00091—Gregory F. Van Tatenhove, District Judge.

Argued: January 28, 2021

Decided and Filed: August 9, 2022

Before: BATCHELDER, STRANCH, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Thomas H. Dupree, Jr., GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. John A. Lucas, BROCK SHIPE KLENK PLC, Knoxville, Tennessee, for Appellees. **ON BRIEF:** Thomas H. Dupree, Jr., Jacob T. Spencer, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellants. John A. Lucas, W. Edward Shipe, BROCK SHIPE KLENK PLC, Knoxville, Tennessee, Scott M. Webster, TOOMS, DUNAWAY & WEBSTER, London, Kentucky, for Appellees.

---

**OPINION**

---

NALBANDIAN, Circuit Judge.  By all accounts, this case involves discovery abuses and violations that are (thankfully) unusual in their frequency and mendacity.  That conduct by Defendants resulted in the ultimate sanction—default judgment for the Plaintiffs.  That judgment, however, is not this appeal's subject, the damages awarded by the district court are.

New London Tobacco Market, Inc. and Fivemile Energy, LLC, ("New London") sued Kentucky Fuel Corporation and James C. Justice Companies, Inc. ("Kentucky Fuel") for breach of contract and fraud.  During this litigation, Kentucky Fuel committed a string of egregious discovery violations.  As a result, the district court entered default judgment against it and awarded damages to New London on all counts.  On appeal, Kentucky Fuel challenges these awards.  For the reasons below, we affirm in part, reverse in part, and remand.

**I.**

*The agreements.*  This case is about a coal-mining arrangement gone wrong.  In 2005, New London acquired several leases and related permits to mine coal on various properties.[1]  A short time later, it assigned these leases and permits to Kentucky Fuel with the understanding that Kentucky Fuel would mine the coal and New London would get a cut.

But things did not go as New London had planned.  Five years passed and Kentucky Fuel did not mine any of the coal. So by 2010, the leases expired with no coal to show for it.  Despite the delay, New London gave Kentucky Fuel another chance.  The parties made various amendments to their original agreement.  Relevant here is the fourth amendment ("Agreement").

This Agreement included a "Covenant to Mine" in which Kentucky Fuel promised "to use commercial and reasonable good faith and best efforts to maximize within the constraints of

---

[1]Because the district court entered default judgment against Kentucky Fuel, which Kentucky Fuel does not challenge on appeal, we take the factual allegations in the complaint as true.  *United States v. $525,695.24, Seized from JPMorgan Chase Bank Inv. Acct. #xxxxxxxx*, 869 F.3d 429, 441–42 (6th Cir. 2017); *see also* 10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 2688.1 (4th ed. 2022).

industry standards the amount of coal extracted from these real properties." (R. 40-5, Agreement, PageID 337, ¶ 10.) The parties also agreed to various fee arrangements. The first arrangement provided for a retainer fee. Kentucky Fuel agreed to pay New London a monthly retainer fee of $10,000 for assistance with leasing and permitting matters. This retainer would remain in effect until thirty days after either party sent a termination notice to the other. The second covered minimum monthly royalty fees that had to be paid no matter how much coal was mined. The third, tonnage royalty fees, were New London's cut; Kentucky Fuel agreed to pay a fee for every ton of coal it mined.

To make sure it got these tonnage fees, New London built a failsafe into the Agreement. If Kentucky Fuel breached, such as by not mining, New London could "determine the estimated lost [tonnage] royalties that it would have received." (R. 40-5, Agreement, at PageID 336, ¶ 7.) To calculate that amount, New London would select an "independent arbiter." (*Id.*) Last, the Agreement included a choice-of-law clause, in which the parties agreed Kentucky law governs.

Despite this new Agreement, Kentucky Fuel still did not mine any of the coal, saying it would be unprofitable. Of course, the Agreement did not make an exception for unprofitability. Still, Kentucky Fuel pointed to the "covenant to mine," arguing that the "constraints of industry standards" language relieved it of its obligation to mine where the coal's quality was poor and the permits too expensive. (R. 424, Evidentiary Hr'g Tr., PageID 10403.)

*The lawsuit.* New London responded with a lawsuit, alleging breach of contract and fraud. Its amended complaint raised five counts, three relevant here.[2] In Count I, New London claimed that Kentucky Fuel breached the contract by failing to pay its monthly retainer fees.[3] In Count II, it alleged that Kentucky Fuel also breached when it refused to mine, costing it lost tonnage royalties. And in Count V, it asserted that Kentucky Fuel fraudulently induced New

---

[2]Shortly after the filing of the lawsuit in 2012, Kentucky Fuel sold its interests in the properties to NewLead Holdings, Ltd. But NewLead never mined the properties and defaulted on the transaction. Then in 2018, Kentucky Fuel sold the properties to GSI Coal & Mining, LLC., which has not mined either.

[3]Count I also asked for damages for lost minimum monthly royalty payments, but these damages were not awarded below and thus are not before us on appeal.

London to enter into the contract when Kentucky Fuel had no intention of performing its obligations.

To this amended complaint, New London attached a report from Bob Conway with the amount of lost tonnage royalties (Count II). Conway was New London's "independent arbiter" and "the person most knowledgeable about the [relevant] properties and their coal," as he had completed the original 1800-page permit application. In the report, Conway concluded that the properties held about 18.6 million tons of mineable coal, and that by failing to mine, Kentucky Fuel cost New London $16,990,900.

As the litigation proceeded, Kentucky Fuel committed several egregious discovery violations. It missed production deadlines, failed to produce documents, and at least one of its corporate officers skipped a deposition. The magistrate judge found Kentucky Fuel's behavior so egregious that it set "an unfortunate new low in [his] experience." (R. 302, R. & R., PageID 7890 n.4.) So following the magistrate judge's recommendation, the district court entered default judgment as a sanction. The default judgment established Kentucky Fuel's liability as to the relevant counts.

With liability established, the district court instructed the magistrate judge to hold an evidentiary hearing and assess damages. At first, the magistrate judge thought that a hearing was unnecessary. And so he recommended damages based on the record. But the district court rejected his recommendation and instructed him to hold an evidentiary hearing. The district court explained that a hearing was necessary to give Kentucky Fuel an opportunity to present evidence on damages.

*The damages awards.* After the hearing, the magistrate judge recommended awarding New London damages on all three counts. For the monthly retainer fees, he recommended $970,000. Recall that these fees accrued monthly until the parties terminated the Agreement. In its amended complaint, New London alleged that these fees continued to accrue "from and after the filing of the amended complaint." (R. 437, R. & R., PageID 11414; R. 40, Am. Compl., PageID 256.). The magistrate judge accepted this allegation as true because he thought the effect of default judgment required it. From there, he counted the number of unpaid months and

multiplied it by the $10,000 monthly fee to arrive at $970,000.  Then he awarded eight-percent prejudgment compound interest on that sum, noting that it was required by Kentucky law.

Next, the magistrate judge tackled the lost tonnage royalties (Count II).  He recommended $16,990,900 in damages.  These calculations were easier.  Kentucky Fuel's breach of the contract (established by default judgment) triggered New London's authority to select an "independent arbiter."  New London selected Conway, and he calculated the lost tonnage royalties to be $16,990,900.  After considering Kentucky Fuel's evidence, which he found unpersuasive, the magistrate judge determined that Conway's estimate was the proper assessment of damages.  On this count, too, the magistrate judge recommended awarding eight percent in prejudgment compound interest.

On the last count, fraud, the magistrate judge recommended $17,010,900 in compensatory damages and a similar figure in punitive damages.  He based the compensatory award on two things.  First, he awarded $20,000 for an unreimbursed lease payment, which Kentucky Fuel conceded that it owed.  Second, he explained that Kentucky Fuel's alleged fraud caused New London to miss the (same) tonnage royalties they would have received, which again was $16,990,900.  As for the punitive damages, he recommended an award of a 1:1 ratio with the compensatory award.  And as for prejudgment interest, the magistrate judge did not recommend any here.

The district court adopted the magistrate judge's recommendations for the breach-of-contract awards (Counts I and II).  But it parted ways with the magistrate judge's recommendation for fraud damages (Count V).  On the compensatory part of that award, the district court awarded the undisputed $20,000 in unreimbursed lease payments but not the $16,990,900 in lost tonnage royalties.  In the court's view, while fraud and breach of contract were different claims, the resulting injury—the amount of lost tonnage—was the same.  So double recovery barred compensatory damages for fraud.  Still, the district court explained that the magistrate "correctly calculated the compensatory damages" that New London "*could have recovered* under Count V, if not for the issue of double recovery."  (R. 445, Dist. Ct. Order, PageID 11616 (emphasis added).)  That said, because the rule against double recovery did not bar punitive damages, the district court awarded the $17,010,900 in punitive damages.

This award was "a 1:1 ratio, based on the compensatory damages [New London] would have received" if it was not for double recovery. (*Id.*) Kentucky Fuel appealed.

## II.

On appeal, Kentucky Fuel raises four different types of arguments. The first concerns the breach-of-contract awards. The second challenges the fraud and punitive damages awards. The third relates to attorney's fees. And the fourth is about the award of compound prejudgment interest. We address each in turn.[4]

## A.

Kentucky Fuel begins by challenging the breach-of-contract awards. As mentioned, the district court awarded New London two types of breach-related damages. It gave $970,000 for unpaid monthly retainer fees (Count I) and $16,990,900 for lost tonnage royalties (Count II). We vacate the first award but uphold the second.

### 1.

Consider the unpaid retainer fees first. Kentucky Fuel argues that we should vacate this award because the district court erred in taking the complaint's allegations about the accrual of fees as true. We agree.

Generally, we review "[a]wards of money damages"—including the award of damages based on default judgment—"under an abuse of discretion standard." *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 517 (6th Cir. 2009) (money damages generally); *Flynn v. People's Choice Home Loans, Inc.*, 440 F. App'x 452, 455 (6th Cir. 2011) (default judgment). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or uses an erroneous legal standard." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d

---

[4]New London argues that Kentucky Fuel forfeited all its arguments by not raising them below. Our review of the record shows otherwise; Kentucky Fuel raised all these issued below. (*See* R. 444, Objections, PageID 11586, 11598-99 & n. 18-19 (retainer fees); *Id.* at PageID 11592-94 (tonnage royalties); R. 44, Mtn. to dismiss, PageID 380 (fraud); R. 444, Objections, PageID 11600-01 (compound prejudgment interest); R. 458, Resp., PageID 11946 (attorney's fees).) So Kentucky Fuel adequately preserved them.

205, 218 (6th Cir. 2019) (quoting *Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998)).

Recall that in calculating these damages, the magistrate judge relied on the complaint's allegation that the fees continued to accrue "from and after the filing of the amended complaint." (R. 437, R. & R., PageID 11414; R. 40, Am. Compl., PageID 256.)  As the judge saw it, "the effect of the default awarded" required "a finding that retainer fees have continued to accrue." (*Id.* at 11414–15.).  And the district court adopted this reasoning.

But default judgments do not establish damages.  The effect of a default judgment is that the "factual allegations of the complaint, *except those relating to the amount of damages*, will be taken as true."  10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 2688.1 (4th ed. 2022) (emphasis added); *see also Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 110 (6th Cir. 1995) (holding that default judgment "does not resolve issues relating to damages").  Thus, "a default admits only the defendant's liability" but "the amount of damages must be proved." *Antoine*, 66 F.3d at 110 (quoting *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1026 (5th Cir. 1982) (en banc)).  Because the complaint's assertion about the accrual of fees is an allegation about damages, the district court erred by accepting it as true and we vacate the resulting judgment.

But this still leaves open the question:  When did the monthly retainer fees stop accruing?  Kentucky Fuel offers us two suggestions.  The first sets the outer limit.  Kentucky Fuel suggests that the retainer fee stopped accruing, at the latest, on the date it terminated the Agreement.  The other suggestion ends the accrual earlier, when, according to Kentucky Fuel, New London abandoned the contact.

*The Outer Limit.*  Kentucky Fuel claims that the retainer agreement terminated at the latest on April 1, 2016, when it gave New London written notice.  This argument is partially correct.  That document stated that Kentucky Fuel "now provide[s] clear notice that [New London's] services were and have been terminated."  (R. 262, Prehr'g Memo. Resp., PageID 3246.)  And under the Agreement, either party may terminate the retainer fee by giving a 30-day notice to the other.  So the fee terminates thirty days *after* notice is given, not on the day the

notice is given.  And this means that, at the latest, the retainer agreement terminated on May 1, 2016—thirty days after notice was given.

New London does not challenge the substance of the notice, only its delivery method.  It argues that the notice, which was part of a litigation filing, was insufficient because the Agreement required it to be mailed.  But this argument is unavailing.

In Kentucky, "[t]he specifying of a method of giving notice" to terminate a contract "does not exclude other methods."  *Equitable Life Assurance Soc. of U.S. v. Lawrence*, 563 S.W.2d 717, 719 (Ky. 1978).  That is because "no one needs notice of what he already knows."  *Id.* (quoting 58 Am. Jur. 2d. *Notice* § 4); *see also* 17A Am. Jur. 2d *Contracts* § 533 ("[W]here the notice to terminate is actually received by the plaintiff, it is immaterial that the defendant did not mail it to the exact address specified in the contract.").  In other words, as long as the party received the notice of termination, and the contract does not prohibit the method of delivery, the notice is valid even if the contract states a different method of delivery.[5]  Here, New London received the notice.

In response, New London asserts that under *Deane v. Mitchell*, 227 S.W.2d 893, 894 (Ky. 1950), notice must be given only in the manner specified in the contract.  But *Deane* is distinguishable.  True, the Kentucky Supreme Court said that "notice must be given at the time and in the manner specified."  *Id.*  But that statement was limited to notices to "exercise [an] option to renew" a contract, which is generally "strictly complied with."  *Id.*; *see also Rounds v. Owensboro Ferry Co.*, 69 S.W.2d 350, 354 (Ky. 1934) (explaining that certain equity rules "applicable to contracts generally" do not "apply to contracts creating options").  So the rule from *Deane* cannot be generalized to all contracts.  In any event, the notice requirement in *Deane*

---

[5]This is the rule in other jurisdictions as well.  *See, e.g.*, *New Eng. Carpenters Cent. Collection Agency v. Labonte Drywell Co.*, 795 F.3d 271, 280 n.6 (1st Cir. 2015) ("Courts have consistently found termination notices valid when the other party actually received the notice in a timely fashion."); *Univ. Emergency Med. Found. v. Rapier Invs., Ltd.*, 197 F.3d 18, 22–23 (1st Cir. 1999) (collecting additional cases); *Lloyd's Plan, Inc. v. Brown*, 268 N.W.2d 192, 195 (Iowa 1978) ("Because defendant actually received it, we do not find she suffered any prejudice from the sending of the notice to an undesignated but correct address."); *Ives v. Mars Metal Corp.*, 196 N.Y.S.2d 247, 249 (N.Y. Sup. Ct. 1960) (explaining that "it would be hypertechnical in the extreme to hold" that notice was ineffective when the plaintiff "admits knowledge of the letter," which was "sent to counsel instead of directly to [plaintiff]"); *cf. First Nat'l Bank v. Okla. Saving & Loan Bd.*, 569 P.2d 993, 997 (Okla. 1977) ("[A]s a general rule, one having actual notice is not prejudiced by, and may not complain of failure to receive statutory notice.").

was waived, so the court was not deciding whether the notice's delivery was effective. 227 S.W.2d at 894. The important thing here is that New London received Kentucky Fuel's notice of termination. Because the notice was sent on April 1, 2016, the retainer agreement ended at least on May 1, 2016, making that date the latest point at which the monthly fees stopped accruing.

*The Termination Date.* Still, the monthly fees might have stopped accruing earlier. Kentucky Fuel claims that New London abandoned the contract when it filed the complaint and failed to provide consulting services. Although the magistrate judge found that this "might have [been] a valid claim of abandonment," he did not consider it because of the default judgment. (R. 437, R. & R., PageID 11414.) We need not consider the merits in the first instance. Instead, we remand to the district court to do so.

In short, we vacate the district court's award of $970,000 on Count I. On remand, the district court should decide, in the first instance, when the retainer fees stopped accruing. But the fees should not accrue after May 1, 2016, given Kentucky Fuel's notice.

**2.**

Now turn to the tonnage royalties. The district court awarded New London $16,990,900 for lost tonnage royalties. It based this amount on the calculations of Conway, who was New London's "independent arbiter." On appeal, Kentucky Fuel argues that Conway was neither independent nor an arbiter. We disagree. Conway was an "independent arbiter" under the Agreement. And even if he were not, the district court did not err in relying on his report as evidence of damages, given that Kentucky Fuel offered no expert evidence.

**i.**

Recall that the parties agreed that "[i]f Kentucky Fuel fails to perform under the terms of" the Agreement, then New London could "determine the estimated lost royalties that it would have received but for" the breach. (R. 40-5, Agreement, PageID 336, ¶ 7.) That amount would be determined "by an independent arbiter selected by [New London] for [that] purpose." (*Id.*)

And once these royalties are calculated, the "amount shall be immediately due and payable by Kentucky Fuel." (*Id.*)

Kentucky Fuel does not dispute that New London could appoint an "independent arbiter." Instead, it argues that Conway was not an "independent arbiter" as required by the Agreement. So we begin by interpreting the meaning of "independent arbiter," then we decide whether the district court erred in concluding that Conway fit that definition.

*Independent Arbiter.*  The legal meaning of a contract's terms is a question of law, which we review de novo.  *Baker Hughes Inc. v. S&S Chem., LLC*, 836 F.3d 554, 560 (6th Cir. 2016). Because this is a diversity action, we interpret the contract as a Kentucky court would.  *See United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 402 (6th Cir. 2019).  This means that we must "begin[] with examination of the plain language of the instrument."  *Mostert v. Mostert Grp. LLC*, 606 S.W.3d 87, 91 (Ky. 2020).  But we do not interpret words in a vacuum. Rather, we "endeavor to give effect to the parties' intent as expressed by the ordinary meaning of the language they employed."  *Id.* (quoting *N. Folk Collieries, LLC v. Hall*, 322 S.W.3d 98, 105 (Ky. 2010)).  And so we read the contract "as a whole, giving effect to all parts and every word in it if possible."  *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986).

With that in mind, we start with the plain meaning of the phrase "independent arbiter." The meaning of the word "independent" is clear.  It means someone who is "not subject to external control or rule."  7 *The Oxford English Dictionary* 848 (2d ed. 1989); *see also Independent*, *Black's Law Dictionary* (11th ed. 2019).  The word "arbiter," on the other hand, is not so clear.  As Kentucky Fuel suggests, the word "arbiter" generally means someone "whose opinion or decision is authoritative in a matter of debate" or someone "who is chosen by the two parties in a dispute to arrange or decide the difference between them."  1 *Oxford English Dictionary*, *supra*, at 601.  Examples include "a judge" or "an arbitrator."  *Id.*

But at other times, though, "arbiter" means someone "who has power to decide or ordain according to his or her own absolute pleasure" or "one who has a matter under his or her sole control."  *Id.*  Under this second definition, an "arbiter" is someone "having absolute power" of "determining" or "whose decisions are accepted as final," but who does not necessarily resolve a

dispute between two parties. *Webster's Third New International Dictionary* 110 (2002). For example, the National Bureau of Economic Research is often called the "official arbiter of recessions" because it determines when recessions begin and end. *See, e.g.*, *Defining the R-word*, The Economist (Sept. 28, 2002).[6] Federal courts, too, often refer to state courts as the "final arbiters" of the meaning of state law. *See, e.g.*, *White v. Steele*, 602 F.3d 707, 711 (6th Cir. 2009) (quoting *Thompson v. Bock*, 215 F. App'x 431, 436 (6th Cir. 2007)). In this sense of the word, an arbiter is more like an expert with final say and less like an arbitrator or judge resolving a dispute between two parties.

So which of the two meanings of "arbiter" controls here? Kentucky Fuel argues for the former. It reads the Agreement as creating a dispute resolution provision and concludes that the parties "intended to refer their disputes to a neutral referee who followed some sort of recognized adjudicative procedure before issuing a reasoned decision." (Appellants' Br. at 23.) But we read the provision differently.

Three clues point against Kentucky Fuel's argument. First, consider the independent arbiter's role. Under the contract, New London could determine the lost tonnage royalties if Kentucky Fuel breached their Agreement. Not only that, but New London possessed sole discretion to select an independent arbiter who would calculate the amount. Put in that light, the parties intended that the independent arbiter act more like an expert and less like a judge. The arbiter's role was to calculate an amount, not resolve a dispute. Indeed, what dispute would such an arbiter resolve? Once Kentucky Fuel breached the contract, New London's authority to determine the lost tonnage royalties kicked in. And the parties meant for the "independent arbiter" to simply calculate that amount. That's it.

Second, the provision does not require any specific dispute-resolution procedures. Nothing in the Agreement's language suggests that Kentucky Fuel has a right to present evidence to the "independent arbiter." Nor does it contemplate a hearing. Indeed, Kentucky Fuel rightfully concedes that the provision was not meant to impose a formal arbitration procedure. To put it differently, when it comes to tonnage royalties, Kentucky Fuel's role ended when it

---

[6]Available at: https://www.economist.com/special-report/2002/09/28/defining-the-r-word.

breached the contract, and the contract gives it no right to challenge the independent arbiter's determination.

Third, reading the "independent arbiter" provision to require an adjudicative process makes little sense considering the sentence preceding it. That sentence provides that, upon breach, New London "may determine the estimated lost royalties that it would have received but for the Event of Default by Kentucky Fuel and such amount shall be immediately due and payable by Kentucky Fuel." (R. 40-5, Agreement, PageID 336, ¶ 7.) The Agreement then instructs that "[s]uch royalties shall be determined by an independent arbiter selected by" New London "for [that] purpose." (*Id.*) So New London's authority to determine the lost royalties, and appoint the independent arbiter, is automatic. The parties meant for New London to unilaterally determine the amount of royalties due and not to adjudicate the question. Indeed, why would they assign New London the authority to determine damages if they meant to adjudicate the question? Thus, accepting Kentucky Fuel's reading would strip New London of its bargained-for authority. And we would essentially read this authority to "determine" lost tonnage royalties out of the contract. But we must "giv[e] effect to all parts" of a contract "and every word in it if possible." *Newland*, 705 S.W.2d at 919.

Although inartful, the Agreement's "independent arbiter" provision does not create an adjudicative procedure for dispute resolution or give Kentucky Fuel any rights in determining the calculation. The provision simply gives New London authority to select an individual to calculate the tonnage royalties it would have received if Kentucky Fuel had not breached the contract.

*Was Conway an Independent Arbiter?* With the definition of "independent arbiter" out of the way, we turn to our next question: Was Conway an "independent arbiter" under the contract?

Before we address the merits, we take a moment to discuss the standard of review. Whether the facts of a particular case fall within a contractual definition is a mixed question of law and fact. *See U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgt., LLC v. Vill. at Lakridge, LLC*, 138 S. Ct. 960, 966 (2018) ("A mixed question asks whether 'the historical facts . . . satisfy

the [legal] standard'" (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982))); *see also* Randall H. Warner, *All Mixed Up about Mixed Questions*, 7 J. App. Prac. & Process 101, 134 (2005) (explaining that "whether the facts of a particular case fall within [a] definition," is a mixed question). We follow a "case-by-case approach" to determine the standard of review for mixed questions. *Singh v. Rosen*, 984 F.3d 1142, 1148 (6th Cir. 2021); *see also Am. Premier Underwriters, Inc. v. Gen. Elec. Co.*, 14 F.4th 560, 568–69 (6th Cir. 2021). We apply de novo review if the mixed question "require[s] courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard." *U.S. Bank*, 138 S. Ct. at 967. But when we find ourselves "immerse[d] . . . in case-specific factual issues," we review for clear error. *Id.*

Answering whether Conway was an "independent arbiter" under the contract's terms is closer to the latter than former. To answer the operative question, a court must examine facts like Conway's relevant qualifications, his familiarity with the relevant property, his work related to it, his relationship and interactions with the parties, and the reliability of his calculations. In other words, we have to "take[] a raft of case-specific historical facts, consider[] them as a whole, [and] balance[] them one against the other." *Id.* at 968. This inquiry makes it "about as factual sounding as any mixed question gets." *Id.* And as a fact-intensive mixed question, we review the district court's conclusion for clear error. *See id.* n.7; *Singh*, 984 F.3d at 1148. This means that we disturb a finding only if "upon reviewing 'the entire evidence' we are 'left with the definite and firm conviction that a mistake has been committed.'" *Ackerman v. Washington*, 16 F.4th 170, 180 (6th Cir. 2021) (quoting *Fox v. Washington*, 949 F.3d 270, 276 (6th Cir. 2020)).

Here, we find no such error. As mentioned above, New London could select an "independent arbiter" to "determine the estimated lost royalties that it would have received." (R. 40-5, Agreement, PageID 336.) Acting within this authority, New London selected Conway. Why? Because he was "the person most knowledgeable about the land and its coal reserves." (R. 437, R. & R., PageID 11426.) He prepared the initial 1,800-page mining permit application for the property in 2003, which required more than a year's work. And his independent arbiter's report was based on this work. As the litigation started, Conway also prepared an expert report

estimating that the property contained about 18.5 million tons of mineable coal.  These identical conclusions were based on data he collected in 2003, years before New London contacted him.

What's more, unaffiliated professionals closely corroborated Conway's conclusion about the amount of coal on the property.  In 2011, a company called Summit Engineering estimated that there were 19,794,240 coal tons on the property.  This is about six percent *higher* than Conway's estimate.  And after agreeing to buy the property from Kentucky Fuel in 2013, NewLead announced that the land held "approximately 18.6 million tons."  (R. 264-2, NewLead News Release, PageID 3358.)

Given Conway's expertise and his independently verifiable data, he fits the definition of "independent arbiter" and the district court did not err in relying on his report.

Kentucky Fuel pushes back on two fronts.  It argues that Conway could not have been "independent" because he prepared the report based on New London's instructions.  Nor, it contends, was he an "arbiter" because he did not consider any evidence from Kentucky Fuel.  We find both arguments unconvincing.

As for independence, Kentucky Fuel points to the testimony of New London's president.  He explained that he "asked Mr. Conway pursuant to his engagement letter to do an analysis of the property and to answer the question as posed within the instructions should there be an event of default."  (R. 423, Evidentiary Hr'g Tr., PageID 10249.)  And again, that he "told" Conway to "follow the instructions within the letter" he gave him.  (*Id.* at PageID 10188.)  Kentucky Fuel homes in on the word "instructions," arguing that the results must have been tainted.  But it is unsurprising that New London gave Conway "instructions" to determine the amount of lost royalties.  How else could New London explain the work product it needed?  Apart from this clever semantic argument, Kentucky Fuel has presented no evidence that New London's instructions improperly influenced Conway's report.

Besides, third parties independently corroborated Conway's report two times over.  Had Conway in some way exaggerated his report to favor New London, we would expect these interested parties—conducting independent assessments—to conclude that there was less coal on

site.  But they did not.  So it is not reasonable to assume that Conway was not under the control of New London.  Rather, he was "independent" as required by the contract.[7]

Next, Kentucky Fuel asserts that Conway was not an "arbiter."  An arbiter, it tells us, must "hear from both sides before ruling," which Conway did not do.  (Appellants' Br. at 24.) But our interpretation of "arbiter" above takes care of this argument.  As we explained, the word "arbiter" in the Agreement does not mean what Kentucky Fuel wants it to mean.  Conway is less like an arbitrator and more like an assessor meant to calculate New London's lost tonnage royalties, which he did.

**ii.**

But even if Conway did not qualify as an "independent arbiter," we would still affirm the district court's award for another reason:  Kentucky Fuel provided no solid evidence of its own. Kentucky Fuel had the opportunity, at the three-day evidentiary hearing, to challenge the reliability of Conway's report and present its own calculations.  But it failed to do so.

As explained above, we review the district court's damages award for abuse of discretion. *Hance*, 571 F.3d at 517.  The district court treated Conway's report not as the last word on damages but as evidence of damages.  In fact, when the magistrate judge first recommended damages based on the report and without an evidentiary hearing, the district court rejected his recommendation.  It instructed the magistrate judge to hold an "evidentiary proceeding" so that Kentucky Fuel can "contest the amount of damages."  (R. 321, Dist. Ct. Order, PageID 321); *see Antoine*, 66 F.3d at 110 (explaining that "ordinarily" after default judgment "the district court must hold an evidentiary proceeding in which the defendant has the opportunity to contest the amount of damages" (cleaned up)).  Indeed, the district court expressed concern in treating Conway's report as conclusive, saying that it was "hesitant to rely primarily on the very short independent arbiter's report to award damages of such a magnitude."  (R. 321, Dist. Ct. Order,

---

[7]Kentucky Fuel tries to show that New London controlled Conway's report in another way.  It says that New London could have stifled commissioned reports until it received a particularly favorable one.  But any competent discovery would have revealed these communications.  And New London represents to us that such communications do not exist.  In any event, Conway's credentials and familiarity with the property convince us that he was likely chosen based on his expertise.  And the independent verification of his results suggests no impropriety.

PageID 8396.)    So the district court afforded Kentucky Fuel "the opportunity to speak meaningfully towards the damages calculation" and to "present any evidence regarding mitigation of damages or any other analysis they think is important for [the] [c]ourt to consider." (*Id.*)  This, the court explained, was necessary because of "the logistics of mining coal" which "complicate the analysis of damages." (*Id.*)  Kentucky Fuel had the opportunity to present its own evidence on tonnage-royalty damages.

But the court did not find any of Kentucky Fuel's evidence persuasive.  For starters, Kentucky Fuel was not focused on damages.  Rather, as the magistrate judge explained, its evidence largely sought to "relitigate [its] liability," which had been established by the entry of default judgment.  (R. 437, R. & R., PageID 11420.)  And when it did dispute damages, Kentucky Fuel's efforts were fruitless, offering little to challenge Conway's report.  For example, Kentucky Fuel never prepared its own expert report.  Nor did it call an expert witness to dispute the Conway report's reliability.  And it did not even depose Conway to try to discredit him.  Rather, it focused on the logistics of mining the coal, arguing that the report's damages calculation was not reliable because mining the coal was economically unfeasible—a fact it claims Conway ignored.

And Kentucky Fuel undermined its own evidence.  After all, it entered into agreements with GSI and NewLead to have them mine the coal.  And it expected GSI to mine the coal "at the rate of 5,000 to 10,000 tons per month." (*Id.* at 11429.)  Indeed, it expressly told the court that those agreements would "generate enough revenue to pay the damages." (*Id.*)  Kentucky Fuel explicitly conceded that there was enough mineable coal on the land that could cover Conway's assessment.  As the magistrate judge put it, "although [Kentucky Fuel] ha[s] argued vigorously for years before this [c]ourt that the coal could not be profitably mined, [it was] simultaneously assuring the other parties . . . that the coal could be profitably mined." (*Id.* at 11430.)  So the district court ultimately rejected its argument that the coal was not mineable.

Conway's report was evidence of damages—evidence that Kentucky Fuel discounts— and evidence of which the district court was at least skeptical.  But given the chance to contest the issue, Kentucky Fuel offered virtually nothing in response and even undermined its claim

that the coal was not mineable. In this circumstance, at a minimum, we cannot say that the district court abused its discretion in relying on Conway's report to assess damages.

\* \* \* \*

In sum, Conway was an "independent arbiter" under the Agreement. But even if he were not, his report provided admissible evidence of damages that Kentucky Fuel failed to rebut. Thus, the district court did not err in relying on the results of his report, and we affirm the district court's award of damages on Count II.

**B.**

We turn to the district court's award of fraud and punitive damages (Count V). Recall the various aspects of this award. The district court found that New London could have recovered $17,010,900 in compensatory damages based on fraud, but it did not award $16,990,900 of that amount because of the bar against double recovery. As for the remaining $20,000, the district court awarded that amount for "unreimbursed lease payments." The court also awarded $17,010,900 in punitive damages based on its determination that New London could have recovered fraud damages were it not for the double-recovery bar.

Kentucky Fuel argues that the district court erred in awarding the punitive damages. As it sees it, New London's fraud claim failed because it did not plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Kentucky Fuel also contends that Kentucky's choice-of-remedies rule and the economic-loss doctrine bar New London from recovering for both breach of contract and fraud. And because New London cannot recover any fraud damages, Kentucky Fuel concludes, the punitive award has no legs to stand on.[8] We agree and vacate the punitive damages award.[9]

---

[8]Because we vacate this award, we need not address Kentucky Fuel's argument that it was excessive and unconstitutional under *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996).

[9]We do not , however, vacate the $20,000 awarded under Count V. Although the district court apparently awarded these damages under Count V, these are not damages for fraud. The district court was clear that it was not awarding any compensatory damages for fraud—it said that the $20,000 were for "unreimbursed lease payments." So it treated these damages like a restitution award, not fraud damages. And because Kentucky Fuel did not dispute them—in fact, it admitted that it owed this money and would pay it—we will not vacate this award.

### 1.

Begin with the fraud allegation.  Default judgment on a particular claim can stand only if "there was a 'sufficient basis in the pleadings for the judgment entered.'"  *United States v. $525,695.24, Seized from JPMorgan Chase Bank Inv. Acct. #xxxxxxxx*, 869 F.3d 429, 441 (6th Cir. 2017) (quoting *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  So "[e]ven after default" the court must still "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law."  10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 2688.1 (4th ed. 2022).  Thus, Kentucky Fuel can contest the sufficiency of New London's pleadings on appeal.  *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 407 (6th Cir. 2010); *see also Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988) ("Although the entry of default was within the court's discretion, [the appellant] may contest the legal sufficiency of allegations contained in the complaint."); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 n.23 (2d Cir. 2011) (collecting cases).

A party "alleging fraud" must "state with particularity the circumstances constituting fraud."[10]  Fed. R. Civ. P. 9(b). We review the district court's Rule 9(b) analysis de novo. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011).  At a broad level, "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).  More specifically, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.*, 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)).  Further, the plaintiff must describe "the fraudulent scheme" and "the resulting injury."

---

[10]Although this is a diversity action where state law governs the burden of proving fraud, Rule 9(b) governs "the procedure for pleading fraud in all diversity suits in federal court." *Minger v. Green*, 239 F.3d 793, 800 (6th Cir. 2001); *see also Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 498 (6th Cir. 2014); 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure Civil* § 1297 (4th ed. 2022).

*Chesbrough*, 655 F.3d at 467 (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)).

Three omissions are fatal to New London's fraud pleading under Rule 9(b). First, New London never identified the person who made the misrepresentation. Second, it did not explain why the statements were fraudulent. And third, it failed to describe the injury that resulted from any alleged fraud.

*The Person.* New London never identified the person who made the allegedly fraudulent misrepresentation. Instead, it alleged generally that Kentucky Fuel made fraudulent representations, but that is not enough. *See, e.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003) (holding that a complaint did not meet Rule 9(b)'s pleading requirement where it failed to "specify the names of any individuals involved").

On appeal, New London tries to correct its omission and gives a name. It claims that Steve Ball is the one who made the misrepresentation. It bases this conclusion on the fact that Ball signed the contract, and the contract was attached to the complaint. So, New London claims, it was obvious that Ball was the one who made the misrepresentation.

The problem? Ball's name does not appear in the complaint. Indeed, New London's argument hurts more than it helps. By having to point outside the complaint to find the name, New London implicitly concedes that it did not identify that person in the complaint itself, which is enough to make its pleading defective. That Ball's name appeared on the contract attached to the complaint is not enough either. This inference is too implausible. Other contracts and documents bearing other Kentucky Fuel signatures were also attached to the complaint. So it is unclear why Ball's signature alerts New London that he is the one who made the relevant misrepresentations. And even assuming his signature is the only one that appeared, how is a signature enough to infer that it was Ball, and not someone else from the company, who made the misrepresentation? Such an implausible inference undermines Rule 9(b)'s specificity requirement, which is meant to give the defendant "fair notice." *See Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988). Attaching a contract with Ball's signature did not give that notice.

So without the identity of the person who made the misrepresentation, New London's complaint was defective under Rule 9(b). And New London cannot now "use [its] brief on appeal to cure defects in [its] pleadings below." *Hines v. Langhenry*, 462 F. App'x 500, 504 (6th Cir. 2011).

*The Reason.* New London also never explained why the statements were fraudulent. *See Frank*, 547 F.3d at 570. New London's theory of fraud is that Kentucky Fuel entered the contract when it had no intention to: (1) "make the payments required" or (2) "perform their obligations." (*See* Appellees' Br. at 37–40.)

But New London's complaint fails to explain why these statements are fraudulent. It offers no factual allegations that would distinguish between the contractual duties that Kentucky Fuel intended to keep and the contractual duties it allegedly offered in bad faith. New London also takes inconsistent positions. For purposes of the breach-of-contract claims, it alleges that Kentucky Fuel entered the tonnage royalty provision in good faith. Yet for purposes of Count V, it alleges Kentucky Fuel entered the same provisions in bad faith. But New London cannot have its cake and eat it too.

To be sure, New London pointed to Kentucky Fuel's "bad reputation and its prior bad faith" as well as its failure to take the reasonable steps to obtain the necessary mining permits. (R. 40, Compl., PageID 251, 249–50, 254.) Yet these past actions do not "make it reasonable to believe that the defendant knew" that some of the contract terms were misleading while others were not. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 406 (6th Cir. 2012) (citation omitted). In other words, Kentucky Fuel's past practices do not explain why only two promises were entered fraudulently and the rest were not.

*The Injury.* New London's amended complaint also did not explain "the resulting injury" from the fraud. *Chesbrough*, 655 F.3d at 467 (quoting *Bledsoe*, 501 F.3d at 504); *see also Eifler v. Greenamyer*, No. 2017-CA-000079-MR, 2019 WL 2712618, at *5 (Ky. Ct. App. June 28, 2019) (listing "injury" as an element of fraudulent inducement). To establish fraud, New London needed to plead specific damages that it suffered by relying on Kentucky Fuel's misrepresentation. *See Eifler*, 2019 WL 2712618, at *6. As pleaded, New London's alleged

injuries in Count V stem from Kentucky Fuel's failure to perform contractual duties, not its reasonable reliance on Kentucky Fuel's misrepresentation. Indeed, New London only alleged that it "lost the value of the royalties payable in connection with" the properties. (R. 40, Am. Compl., PageID 260.) But these are just the contractual damages it already alleged; a contractual breach is one thing and fraud is another.[11] Thus, New London never explains how Kentucky Fuel's failure to perform under either the lost tonnage provision or the covenant to mine gave rise to fraud damages.

At bottom, New London's amended complaint fails to meet Rule 9(b)'s requirement. And so the district court erred in entering default judgment on Count V.

**2.**

Even if New London had sufficiently pleaded fraud in the complaint, two doctrines still bar recovery. The first is Kentucky's choice-of-remedies rule. And the second is the economic-loss doctrine.

*Choice-of-remedies*. Kentucky law prohibits recovery for both breach of contract and fraudulent inducement. *Hampton v. Suter*, 330 S.W.2d 402, 406 (Ky. 1959). "Where an individual is induced to enter into the contract in reliance upon false representations, the person may maintain an action for a rescission of the contract, or may affirm the contract and maintain an action for damages suffered on account of the fraud and deceit." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 261 (Ky. Ct. App. 2007) (citation omitted). But it cannot do both. *Hampton*, 330 S.W.2d at 406. Although "a party may alternatively *plead* both a fraudulent inducement claim and a breach of contract claim," it "may not *recover* upon both claims." *LV Ventures, LLC v. Schott*, No. 2011-CA-473, 2012 WL 5039235, at *4 (Ky. Ct. App. Oct. 19, 2012) (emphasis added). As the Supreme Court of Kentucky has held, "one claiming to have been defrauded into making a contract has an option either to disaffirm the contract and seek its rescission or to affirm the contract and seek remedy by an action for damages." *Hampton*, 330 S.W.2d at 406. But one cannot "follow inconsistent remedies." *Id.* If one "affirms the contract,

---

[11]The closest New London comes is paragraph 15, where it alleged that it paid to renew a permit that Kentucky Fuel was contractually obligated to maintain. Perhaps if it had never entered the contract, New London would not have incurred these costs. But this conduct is not the basis of Count V or any other count.

his election is irrevocable and he condones the fraud." *Id.*; *see also Eifler*, 2019 WL 2712618, at *6 ("[T]he trial court erred by permitting [the plaintiff] to seek damages from the jury for both breach of contract and fraud.").

Here, the district court awarded New London $16,990,900 for lost tonnage royalties, a breach-of-contract remedy (Count II). It follows that New London cannot also recover for fraudulent inducement. *See LV Ventures*, 2012 WL 5039235, at *5. Doing so would be awarding New London "inconsistent remedies." *Hampton*, 330 S.W.2d at 406. After all, in asking for breach-of-contract damages, New London affirmed the contract. But recovering for fraudulent inducement would require it to simultaneously disaffirm the contract—an outcome Kentucky law prohibits. *Id.*

New London does not dispute that Kentucky law prohibits recovery for both breach of contract and fraudulent inducement. Instead, it argues that Kentucky's choice-of-remedies rule is an affirmative defense that a defendant must raise in its answer to the complaint. For support, New London relies on our decision in *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705 (6th Cir. 2012). There, we explained that "[i]t is well established that in order for the defense of election of remedies to be available it must be pled by the party." *Id.* at 715 (collecting cases).

But New London cannot rely on *Veneklase*. For starters, *Veneklase* did not involve Kentucky law. And New London cites no Kentucky authority that treats the choice-of-remedies rule as an affirmative defense. But even if *Veneklase* governed, New London reads too much into it. Contrary to what New London asserts, we did not hold that failure to plead choice of remedies allows the plaintiff to *recover* under contradictory theories. Our holding was narrower. We said that the defendant's omission only allows the plaintiff to "*seek* rescission and damages as *alternative* remedies." *Id.* (emphasis added). This is the rule in Kentucky too. The Kentucky Court of Appeals has held that even if the defendant failed to preserve its choice-of-remedies challenge below, the trial court cannot allow the plaintiff to recover on both breach of contract and fraudulent inducement. *LV Ventures*, 2012 WL 5039235, at *5 n.5. Permitting such recovery, it explained, would be a "palpable error" that "affect[s] the substantial rights of" the defendant and "result[s] in manifest injustice." *Id.*

*Economic-loss doctrine*.  As a corollary to the choice-of-remedies rule, Kentucky law also prohibits recovery for "fraud claims where the damages plaintiffs seek are the same economic losses arising from the alleged breach of contract." *Nami Res. Co. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 335 (Ky. 2018) (internal quotations omitted).  The economic-loss doctrine ensures that the "law of contract" and "the law of torts" do not "dissolv[e] one into the other."  *Id.* (citation omitted).  In other words, the plaintiff can only "recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise."  *Id.* (quotation omitted).  "To that end, the economic loss rule prohibits the recovery of tort damages in a breach of contract case."  *Id.* (citation omitted)  Thus, where the "fraud claim is indistinguishable from the breach of contract claim" the plaintiff cannot recover for the tort claim.  *Id.* at 336.

Did New London allege harm "above and beyond a broken contractual promise"?  We think not.  The complaint alleges that when Kentucky Fuel entered the Agreement, it "did not intend to fulfill its obligations" under the Agreement.  (R. 40, Am. Compl., PageID 260.)  And this, the complaint goes on, caused New London to "los[e] the value of the royalties payable in connection" with the Agreement.  (*Id.*)  So the fraud damages that New London alleged are the same as the contractual damages.  And this is why the district court refused to award compensatory damages on fraud.  As the court explained, the fraud damages were "the same loss" as the lost tonnage royalties.  (R. 445, Dist. Ct. Order, PageID 11616.)  Thus, the economic-loss rule bars recovery for fraud.

New London responds that *Nami* does not govern here because the economic-loss doctrine does not apply to claims of fraudulent inducement, the type of fraud it alleged here.  But this argument is unavailing.

To begin, *Nami* is broad enough to cover this case.  True, the fraud there occurred during the performance of the contract, but the court analyzed the issue broadly.  *Nami*, 554 S.W.3d at 336.  The court explained that "the rule in Kentucky" is that "when a plaintiff may obtain complete relief for his contractual losses by means of compensatory damages under a breach of contract claim," then "he may not simultaneously recover punitive damages after being made whole on his contractual damages"—even if the plaintiff alleges fraud.  *Id.*  Importantly, the

court held that a party "may assert an independent claim for such fraudulent or malicious conduct" only if it "has been aggrieved by fraudulent or malicious conduct which results in damages that *differ* from the damages sustained by reason of the breach of contract." *Id.* (emphasis added).

In applying this standard, the Kentucky Supreme Court focused on the fact that the plaintiff in *Nami* "was made whole through its award for unpaid royalties" and that "[i]t assert[ed] no compensable injury beyond its claim for unpaid royalties" nor did it allege "misconduct by [the defendant] other than the conduct of breaching the contract." *Id.* The same is true here. As already explained, the only damages that New London claimed it suffered from fraudulent inducement are those for lost royalties, which the district court awarded under the breach of contract claim. That award made New London whole, so it cannot recover for fraud.

In any event, we think the fraudulent-inducement exception to the economic-loss doctrine does not apply here. Most states have recognized a fraudulent-inducement exception to the economic-loss doctrine. *See* Ralph C. Anzivino, *The Fraud in the Inducement Exception to the Economic Loss Doctrine*, 90 Marq. L. Rev. 921, 931–34 (2007); *see also Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995) (noting the "trend" in creating an exception to the economic-loss doctrine for certain intentional torts, including fraudulent inducement). Some states have adopted a broad exception, allowing recovery for any fraudulent inducement. *See, e.g.*, *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) ("[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether . . . the plaintiff only suffers an economic loss related to the subject matter of the contract."). Others, however, have adopted a narrower exception, allowing recovery only if the fraudulent inducement was "extraneous" to the terms of the contract—that is, if it was not about the subject of the contract. *See, e.g.*, *Huron Tool*, 532 N.W.2d at 546 (holding that the exception allows the plaintiff to "only pursue a claim for fraud in the inducement extraneous to the alleged breach of contract").

But none allow a plaintiff to recover for the *same* damages under both fraudulent inducement and breach of contract. *See, e.g.*, *Formosa*, 960 S.W.2d at 44 (permitting recovery for fraudulent inducement when the plaintiff sought only tort damages and not breach-of-contract

damages); *see also Trident Steel Corp. v. Wiser Oil Co.*, 223 S.W.3d 520, 529 (Tex. Ct. App. 2006) (explaining that the court in *Formosa* "did not hold [that] the plaintiff could recover the same damages under both theories"); *Huron Tool*, 532 N.W.2d at 546 (barring recovery for fraudulent inducement when the plaintiff "fails to allege any wrongdoing by defendants independent of defendants' breach of contract").

The Kentucky Supreme Court has not explicitly endorsed an exception for fraudulent inducement. But we think any approach it may adopt would not impact the outcome here. That is because New London is attempting to recover the same damages under both breach of contract and fraudulent inducement. Even if the Kentucky Supreme Court adopted a broad fraudulent-inducement exception, New London would be unable to recover under both theories for the same damages. And that tracks our earlier discussion: Under Kentucky law, a party cannot recover for both breach of contract and fraudulent inducement. So both the economic-loss doctrine and choice-of-remedies rule bar New London from recovering any fraud damages.

\* \* \* \*

In sum, we disagree with the district court that New London could have recovered compensatory fraud damages in this case. This leaves New London only with the breach-of-contract damages. But those cannot support a punitive award. Kentucky law is clear that "[i]n no case shall punitive damages be awarded for breach of contract." Ky. Rev. Stat. § 411.184(4). So we must vacate the $17,010,900 in punitive damages under Count V.

## C.

We next consider the district court's award of attorney's fees to New London. Because we vacated the monthly retainer fee award (Count I) and the punitive damages award (Count V), we think that the most prudent course of action is to vacate the attorney's fees award too. On remand, the district court may alter those fees or adhere to its original calculation. We offer no view but leave it to the district court to consider the issue in the first instance.

**D.**

Finally, we come to Kentucky Fuel's challenge to the prejudgment interest. The district court awarded New London eight-percent compound interest on its award of lost tonnage royalties (Count II.)**[12]** Kentucky Fuel challenges this award on three fronts. It argues that the district court erred in awarding prejudgment interest on an unliquidated claim, in setting the interest rate at eight percent, and in compounding that rate. We reject these contentions and affirm the district court. But because the district court erred in calculating *when* the interest rate began to accrue, we remand on that narrow ground.

In diversity cases, "state law governs awards of prejudgment interest." *FDIC v. First Heights Bank, FSB*, 229 F.3d 528, 542 (6th Cir. 2000). And we review such awards for abuse of discretion. *Poundstone v. Patriot Coal Co.*, 485 F.3d 891, 901 (6th Cir. 2007).

Under Kentucky law, if a claim is "liquidated"—that is, "[m]ade certain or fixed by agreement of parties or by operation of law"—Kentucky courts award prejudgment interest "as a matter of course." *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 141 (Ky. 1991) (quoting *Liquidated*, *Black's Law Dictionary* (6th ed. 1990)). If, on the other hand, the damages are "unliquidated"—which is to say they "have not been determined or calculated" or "not yet reduced to a certainty in respect to amount"—then it is within the trial court's discretion whether to award prejudgment interest. *Id.* at 141, 145 (quotation omitted); *see also 3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 450 (Ky. 2005).

In deciding whether to award prejudgment interest, Kentucky courts consider "all the circumstances" and "balance[] the undisputed facts and equities." *Nucor Corp.*, 812 S.W.2d at 144–45 (quotation omitted). They award prejudgment interest if "under the particular circumstances of this case, fairness justifies and indeed dictates an award of compound prejudgment interest." *Reliable Mech., Inc. v. Naylor Indus. Servs., Inc.*, 125 S.W.3d 856, 858 (Ky. Ct. App. 2003). And by statute, Kentucky caps the rate on prejudgment interest to eight percent.

---

**[12]**The district court also awarded prejudgment interest for Count I, but Kentucky Fuel does not challenge that decision. And even if it had, because we remanded that award to the district court, we need not decide in the first instance whether it would be proper to award prejudgment interest on that count.

*Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001).  But district courts can still "calculate" the rate and set it lower.  *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 497 (6th Cir. 2013).  Whether the interest compounds is also left to the court's discretion.  *Reliable Mech.*, 125 S.W.3d at 858.  And "[w]hile pre-judgment interest has traditionally been simple interest, case law does not indicate that it is required to be so."  *Id.*

Here, both parties agree that the lost tonnage royalty award is unliquidated.  So we need to only ask one question:  Did the district court abuse its discretion in awarding an eight percent compound prejudgment interest rate?  We hold that it did not.

The district court adopted the magistrate judge's finding that Kentucky Fuel "repeatedly engaged in discovery abuses, and defied orders" of the court, which turned the court's "processes into a tool for obstruction and delay." (R. 445, Dist. Ct. Order, PageID 11613.)  And it adopted his reasoning that "prejudgment interest is not being imposed to punish" Kentucky Fuel but to "compensate" New London "for the denial of access to money they could have received years ago" without the obstruction. (*Id.*)  As the district court explained, New London's "use of the funds at issue here was delayed substantially, beyond what is to be expected in the course of typical litigation, due to [Kentucky Fuel's] misconduct." (*Id.*)  Thus, the district court awarded prejudgment interest at the rate of eight percent.  We have upheld a similar prejudgment interest award for obstructive discovery tactics.  *See ClassicStar*, 727 F.3d at 496–97; *cf. Howe v. City of Akron*, 801 F.3d 718, 751 (6th Cir. 2015) (applying federal law and holding that the district court abused its discretion in not awarding prejudgment interest to plaintiffs where defendants delayed the judicial process).  So the district court did not abuse its discretion.

As for the compound interest, the Kentucky Court of Appeals has upheld an award of prejudgment interest where one party deprived the other of use of its money for several years.  *Reliable*, 125 S.W.3d at 858.  The court reasoned that the deprived party "would have been capable of earning compound interest on its money during this lengthy time period" so "compounded pre-judgment interest reconciles and adjusts that inequitable result." *Id.*  Here, the district court awarded compounded prejudgment interest because of the substantial delay that Kentucky Fuel caused.  This decision too fell within the district court's discretion.

Kentucky Fuel makes two arguments in response.  Both are unavailing.  First, it argues that the magistrate judge relied, in part, on the fraudulent claim as a rationale for awarding interest.  True.  But the district court did not adopt that rationale.  Instead, it reviewed the magistrate judge's decision de novo and relied only on the discovery-violation rationale.  (R. 445, Dist. Ct. Order, PageID 11603–04.)  There is no sign that the district court agreed with the magistrate judge that fraud supported prejudgment interest.  In any event, because the discovery violation alone was sufficient to award prejudgment interest, any mistake about the fraud rationale does not affect the outcome.

Second, Kentucky Fuel argues that eight percent overcompensates New London.  It claims that eight percent was too high, and the district court should have relied on the real interest rates, awarding less than three percent.  But Kentucky law permits the district court to award interest up to eight percent, and we have affirmed such awards for discovery violations. *See Osborn v. Griffin*, 865 F.3d 417, 456–60 (6th Cir. 2017) (applying Kentucky law); *ClassicStar*, 727 F.3d at 494–97.  Kentucky Fuel merely disagrees with the district court's assessment that eight percent sufficiently compensates New London.  But mere disagreement is not enough to show that the district court abused its discretion.

Although the district court did not err in awarding prejudgment interest or setting it at eight percent, we think it erred in determining when that interest should begin to run.  The court awarded interest from the date that Conway completed his royalty report, May 1, 2012.  The Agreement, it explained, contemplated that the independent arbiter's estimate will be "immediately due and payable."  (R. 40-5, Agreement, PageID 336).

We see things differently.  Yes, Conway's estimate is "immediately due and payable." (*Id.*)  But the interest should not begin to run until Kentucky Fuel receives notice of the amount due.  Allowing interest to accrue without notice would be inequitable because Kentucky Fuel could not avoid paying interest if it did not know how much was due.  And suppose New London had waited months or years after Conway's assessment to file the complaint, should interest accrue over that time?  We think not. *See, e.g.*, *Howard v. Howard*, No. 2011-CA-000930-MR, 2012 WL 4037603, at *2 (Ky. Ct. App. Sept. 14, 2012) ("It would be inequitable to require the payment of interest after an intentional sixteen . . . year delay.")  We find that interest should be

awarded from the date on which Kentucky Fuel received the independent arbiter's report: May 8, 2012. *See Guthrie v. Guthrie*, 429 S.W.2d 32, 36–37 (Ky. 1968) (holding that "interest should be allowed . . . in the absence of factors making it inequitable").

We thus affirm the district court's prejudgment interest award in all respects except the date on which interest begins to accrue. And we remand with instructions to calculate the interest due from March 8, 2012.

## III.

For the reasons above, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.